# SOCIÉTÉ VINICOLE DE CHAMPAGNE v. MUMM CHAMPAGNE & IMPORTATION CO., Inc.

District Court, S. D. New York.
March 22, 1935.

C. P. Goepel, of New York City, for plaintiff.

Lyle T. Alverson, of New York City, for defendant.

## WOOLSEY, District Judge.

I grant the motion to strike out the first, second, third, and fifth alleged separate defenses and do not give leave to amend.

I grant the motion to strike out the counterclaim and do not give leave to amend.

I grant the motion to strike out the fourth alleged defense with leave to amend as herein indicated within twenty days from the service on the defendant's attorneys of the order entered on this motion with notice of entry. Failing that amendment, the fourth defense will also be finally stricken out.

I. A motion to strike out separate defenses, being the equivalent of a demurrer, opens up the entire record as do many other kinds of interlocutory motions. Cf. Park v. Warner Brothers et al. (D. C.) 8 F. Supp. 37, 38; Welch v. Warner (D. C.) 47 F.(2d) 231, affirmed 47 F.(2d) 232 (C. C. A. 2); Sklarsky v. Great Atlantic & Pacific Tea Co. (D. C.) 47 F.(2d) 662, 665; Cheatham v. Wheeling & Lake Erie Railway Co. (D. C.) 37 F.(2d) 593, 598, 599.

The purpose of all interlocutory motions of this kind is to raise properly pleaded issues of fact which can be tried. In dealing with motions of this kind, therefore, when the record is thus opened up, the court can often find in other parts of the pleadings than the defenses at which the motions are aimed, matters which will assist in the determination of the wisest method of dealing with the motions in order to achieve the purpose of getting at the issues of fact involved.

II. In the instant motions the pleadings have been amplified by submitting to me certain documents which are incorporated therein by reference and of which profert is made by one party or the other.

These documents conveniently fall into the following categories:

(1) Agreed copies of the French text and translations into English of three decisions, rendered successively on October 24, 1921, on December 16, 1923, and on November 23, 1933, by the Mixed Franco-German Arbitral Tribunal, hereinafter referred to as the Mixed Tribunal, set up pursuant to the provisions of article 304 of the Treaty of Versailles in a series of three international litigations in which the Société Vinicole de Champagne, plaintiff in this cause, was represented by the French government through its agents, and Herman von Mumm, Walther von Mumm, and Mrs. Emma von Mumm Passavant, widow of Peter von Mumm, who were the partners in the former firm of G. H. Mumm & Co., were represented by the German government through its agent. It may appropriately be observed that in the first two decisions the Mixed Tribunal was unanimous, and that in the third the German agent filed a dissent allegedly on jurisdictional grounds.

(2) Copies (a) of the award, made on July 11, 1932, by the arbitrators chosen by the parties to an arbitration held in pursuance of the provisions of section 1003 of the French Civil Code between the Société Vinicole de Champagne, the plaintiff in this cause, and the several individuals above mentioned who were involved in the said international litigations, and (b) of the order of the Court of First Instance of the Department of the Seine permitting the filing of the said award (on the ground that it did not contain anything contrary to the public policy of France) and ordering its execution according to its tenor.

(3) Photostatic prints, certified by the United States Patent Office, of two sets of assignments showing the sale to the plaintiff in this cause by the French liquidator of all the property of G. H. Mumm & Co. of every kind.

III. From the pleadings thus amplified by these exhibits emerge the following facts undisputed for the purposes of this motion:

In 1856 the firm of G. H. Mumm & Co. was organized at Rheims, France, under the laws of France as a société en nom collectif, with members of the Mumm family as a preponderating majority of the beneficial owners thereof.

From January 1, 1900, and until the events hereinafter mentioned, all the beneficial ownership of G. H. Mumm & Co. was in members of the Mumm family; the partners in the firm being Herman von Mumm, Walther von Mumm, and Mrs. Emma von Mumm Passavant, widow of Peter von Mumm.

G. H. Mumm & Co., which was always domiciled at Rheims, in exporting wine from France into the United States used

on their labels trade-marks which were owned and registered by them in France and registered by them also as owners in the United States, as, inter alia, Nos. 55,-641, 55,642, and 55,643 in the United States Patent Office.

From 1891 to the times hereinafter mentioned Frederick De Bary & Co. of New York were the agents of G. H. Mumm & Co. and the distributors of their wines in the United States, where they were sold under the trade-marks above mentioned.

On January 1, 1911, a corporation of New York, called the Mumm Champagne & Importation Company, Inc., precisely the same name as that of the defendant herein, was formed by De Bary & Co., and this corporation, which will be called hereinafter the First Agency Corporation, took over the De Bary business in Mumm wines and continued it as before, selling champagne bottled in France and marked with the Mumm trade-marks.

On December 28, 1914, after the European war had begun, the French government appointed a sequestrator who sequestrated and attached all the properties of every nature and kind of G. H. Mumm & Co. in France.

On August 11, 1920, all the properties of the firm of G. H. Mumm & Co. so sequestrated and attached were sold by a duly appointed Liquidator to the plaintiff which was organized shortly before that date. This sale by its terms covered all the assets of the said firm, all stock in hand, all vineyards, and all other real estate including the premises where the firm headquarters were then situated at No. 29 Rue du Champ de Mars, Rheims, all trade-marks used by the firm, whether registered or not, including all those that were registered, all the good will of said firm, and all the brands belonging to said firm, not only in the Republic of France, but in all foreign countries.

On August 17, 1920, the sale of the G. H. Mumm & Co. properties to the plaintiff was duly confirmed and recorded in the office of the clerk of the court of the First Instance at Rheims.

On January 26, 1921, the First Agency Corporation was dissolved by De Bary & Co. and thenceforth entirely disappears from the situation except as the memory of a name.

On September 9, 1921, the French liquidator confirmed the transfer to the plaintiff herein of all the right, title, and interest of G. H. Mumm & Co. in trade-marks which were owned and registered by G. H. Mumm & Co. in France and registered by it as owner thereof in the United States.

On October 24, 1921, the Mixed Tribunal rendered a unanimous decision in a litigation which had been initiated by the plaintiff against the above-named persons who were the Mumm partners at the time of its seizure, in which it held that the plaintiff had acquired all the trade-marks which had belonged to G. H. Mumm & Co. on January 10, 1920, and had the right to have them transferred to its name and to make use of them in all countries on condition that they should, in countries where the trade-mark law allowed it, add to the name of G. H. Mumm & Co. a printed statement that the plaintiff was the successor of that firm, and prohibiting the partners in the old Mumm firm from opposing the registration of trade-marks by the plaintiff in other countries, or using the Mumm name in any way which would create confusion with Société Vinicole's wines, and requiring the agent of the German government to insure the execution of the Tribunal's decision.

On October 29, 1921, the confirmation of transfer, dated September 9, 1921, of all the G. H. Mumm & Co. trade-marks to the plaintiff herein was recorded in the United States Patent Office.

On December 3, 1921, there was recorded in the United States Patent Office a certified copy of the court record of the clerk of the Court of the First Instance at Rheims showing the sale to the plaintiff by the French liquidator on August 11, 1920, of all the business properties of G. H. Mumm & Co., i. e., as above indicated, its vineyards and other real estate, stock in hand, equipment, inventories, good will, trade-marks, and brands in France and all foreign countries.

On June 8, 1922, the plaintiff, as successor to G. H. Mumm & Co., applied to the United States Patent Office for registration in its name as owner of the American trade-marks Nos. 55,641, 55,642, and 55,643, which were then registered in the name of G. H. Mumm & Co., as owner thereof.

On August 28, 1923, the aforesaid application filed at the United States Patent Office in respect of the Mumm trade-mark No. 55,643 was granted, and it was reg-

istered in the plaintiff's name as owner and given the No. 172,400.

On November 6, 1923, the aforesaid application filed at the United States Patent Office in respect of the Mumm trade-mark No. 55,641 was granted and it was registered in the plaintiff's name as owner and given the No. 175,387.

On December 16, 1923, there was a unanimous decision by the Mixed Tribunal in a second litigation which had been initiated by the plaintiff against the G. H. Mumm & Co. partners, and in that case the above-mentioned Herman von Mumm and Walther von Mumm and firms or companies formed by them in Berne, Switzerland, and Frankfurt, Germany, were condemned for damages in the sum of 3,500,000 francs for not having conformed to the earlier decree made by the Mixed Tribunal on October 24, 1921, and in having filed interferences on applications by the plaintiff herein for transfer of the Mumm trade-marks in Argentine and Great Britain, and the German state was condemned for damages in the sum of 6,000,000 francs for having failed to make that decree effective even in its own Patent Office.

On December 18, 1923, the application filed at the United States Patent Office in respect of the Mumm trade-mark No. 55,-642 was granted, and it was registered in the plaintiff's name as owner with the No. 177,417.

On November 4, 1927, an application was made by the plaintiff to the United States Patent Office for the registration of two more trade-marks, Nos. 97,346 and 97,-877, formerly owned by G. H. Mumm & Co., in the plaintiff's name as owner.

On April 3, 1928, the application just referred to was granted and the trade-marks were registered in the plaintiff's name as owner and given the No. 240,714.

On August 14, 1930, the plaintiff filed a third petition with the Mixed Tribunal against the aforesaid former Mumm partners and the Mumm companies formed by them at Berne and Frankfurt on the Main, on the ground that the former Mumm partners had disregarded the previous decisions and decrees of the Mixed Tribunal and had been guilty of infringement of those decrees by failing when they used the name of G. H. Mumm & Co. to differentiate between the former G. H. Mumm & Co. of Rheims, which the plaintiff bought, and the new Mumm companies in Berne and Frankfurt which had been formed, after the plaintiff's purchase of G. H. Mumm & Co., by the former Mumm partners and asking for damages and other incidental relief.

On June 1, 1932, whilst this litigation was pending in the Mixed Tribunal, apparently, in an endeavor to reach some sort of modus vivendi which would conveniently settle the dispute which seemed to threaten to be perennial between the former Mumm partners and the plaintiff, a private civil arbitration, under section 1003 of the French Civil Code, was agreed on between the plaintiff and the aforesaid Mumm partners as a means of settling and disposing of this third litigation.

On July 11, 1932, the three arbitrators, chosen under the said arbitration agreement by a vote of two to one, prescribed as a modus vivendi for the parties that the Mumm partners referred to in the arbitration as the "Consorts Mumm" could use their patronymic for their own wine if it was followed at once by a statement of the date when the firm or company selling it had been formed and the place at which it was domiciled, that the former Mumm partners should not be allowed to re-establish their business at Rheims even if they should decide to re-establish it in Champagne, that they must change their labels in certain respects, and that the plaintiff Société Vinicole de Champagne could use its name as successor of G. H. Mumm & Co. on its labels and could, as owner, file, nationally and internationally, the trade-marks "Mumm" and "Mumm-Reims," except that they should indicate that they were the successor of G. H. Mumm & Co. at Rheims unless so doing would necessitate under the law of the country where the application was filed the issuance of a new trade-mark, in which event they should have the privilege of renewing the old trade-marks as they then existed.

On July 22, 1932, this arbitration award was permitted by an order of the Civil Court of the Department of the Seine to be filed as above noted in this opinion.

On December 9, 1932, however, the plaintiff claiming that the Mumm partners were not living up to the decision of the said arbitrators, and that, therefore, the plaintiff refused further to be bound thereby, revived before the Mixed Tribunal the third litigation above mentioned.

On September 29, 1933, the defendant, the Mumm Champagne & Importation Com-

pany, Inc., an exact resurrection of the name of the First Agency Corporation, was formed under the laws of the state of New York with a capital of 100 shares, of which Walther von Mumm, who was one of the former partners of G. H. Mumm & Co. of Rheims and a party to all the above-detailed litigations with the plaintiff herein, owned 70 per cent. and was the active head as president. This corporation, which will be called hereinafter the Second Agency Corporation, is now the exclusive agent of the Mumm family in the United States, and claims ownership and title to all the trademarks formerly registered in the United States as owned by G. H. Mumm & Co., and is the defendant herein.

On November 23, 1933, the Mixed Tribunal made its decision in the third litigation and held that the arbitration agreement of June 1, 1932, under the French Civil Code, which was in effect a settlement of a proceeding before the Mixed Tribunal, was without effect because it had not been confirmed by the Mixed Tribunal, and that, consequently, the arbitration judgment of July 11, 1932, based on the arbitration agreement, was void and without effect so far as the Tribunal was concerned, and prohibited the several members of the Mumm family, including Walther von Mumm, from making use of the manufacturing and commercial marks containing the word "Mumm" unless it should be connected with the words "von Schwarzenstein" printed in characters of the same size, shape, and color as the word "Mumm" because Mumm von Schwarzenstein and not von Mumm was found to be the true patronymic of the so-called Mumm family, and that in addition thereto the date of the founding of the firm in question should be shown, and the name and place where it was domiciled should also be indicated by similar type; giving to the plaintiff herein also other incidental relief as to certain details of color, etc., in labels, and again requiring that the plaintiff herein should when using the name "Mumm" or "Mumm-Reims," mention its name as successor in the same characters as they had been hitherto employing.

The German member of the Mixed Tribunal dissented from this decision, apparently on the ground that there was not any ground for holding the award in the Civil Arbitration void, and that in any event the Mixed Tribunal was without jurisdiction to deal with questions of unfair competition which should be left to the civil courts.

On January 30, 1934, the present suit was started on the equity side of this court, asking, inter alia, an injunction against the use of the word "Mumm" in the defendant's name and of its use in connection with trade-marks for the sale of champagne.

The motion herein is directed to five separate defenses and a counterclaim contained in the answer filed by the defendants.

■ IV. From the facts just summarized, it is clear that the defendant herein, the Second Agency Corporation, though bearing exactly the same name as the First Agency Corporation, was formed in New York in 1933, and so is an entirely new entity. It did not exist when the controversies above referred to were decided between the plaintiff and the former partners of G. H. Mumm & Co. either in the Mixed Tribunal or in the French Civil Arbitration.

Moreover, the defendant herein is shown, in the papers before me, to be nothing but a kind of protective emanation of Walther von Mumm or Walther Mumm von Schwartzenstein, whichever his correct name may be. The mere fact that he is the principal stockholder in the defendant corporation and its president does not put that corporation in privity with him so far as any judgments against him are concerned.

Therefore, the decisions in the Mixed Tribunal and in the Civil Arbitration above referred to, so far as the papers before me show, are res inter alios acta, whereby the present defendant would not be bound, and of which, in consequence, it cannot take any advantage unless it is allowed to plead over and by so doing can succeed in mending its hold.

It is, therefore, unnecessary for me to determine on this motion whether a decision of the Mixed Tribunal would be res judicata between the plaintiff and any party who is in privity with the former Mumm partners.

■ This is fortunate because to determine this it would be necessary to have information, which I have not, as to whether there is a form of judgment which is entered on decisions of the Mixed Tribunal because it is well settled that the decision or opinion of a court or the verdict of a jury does not make a matter res judicata.

In order to secure that result the cause must go to a judgment or decree. Reed v. Proprietors of Locks, etc., on Merrimac River, 8 How. 274, 290, 291, 12 L. Ed. 1077; Smith v. McCool, 16 Wall. 560, 561, 21 L. Ed. 324; King v. Chase, 15 N. H. 9, 14, 41 Am. Dec. 675; Lorillard v. Clyde, 99 N. Y. 196, 200, 1 N. E. 614; Springer v. Bien, 128 N. Y. 99, 102, 27 N. E. 1076.

Even with regard to the situation on the French Civil Arbitration, it would probably be necessary to have further information before it could be determined whether the doctrine of res judicata could, for the reasons just stated, be applied in respect of that arbitration as against persons in privity with the former Mumm partners.

V. The defendant asserts the right of using the name chosen for it by its incorporators and denies any confusion of goods. Those issues remain to be decided hereafter. But the other main point raised by the defendant must be dealt with now and it is that the seizure of the business of G. H. Mumm & Co. by the French authorities was necessarily limited to its property corporeal and incorporeal within French territory, and, hence, that the sale of the business did not affect the trade-marks registered by the business in the United States, with the result that the property in such trade-marks here remains still in the former Mumm partners.

The foregoing summary of facts herein show that what may be aptly called the prewar situation in this matter, so far as here relevant, was:

(1) That G. H. Mumm & Co., a copartnership, was domiciled at Rheims, France, manufactured champagne only there, and had for many years as agents and distributors of their champagnes in the United States, at first the firm of De Bary & Co. and thereafter the First Agency Corporation, which was formed by the De Bary firm.

(2) That the trade-marks used by G. H. Mumm & Co. for their champagnes had been used by them for many years, were registered by them in France, and also in the United States Patent Office under the permission contained in section 2 of our Trade-Mark Act, Title 15, United States Code, § 82 (15 USCA § 82).

(3) That the distributors of G. H. Mumm & Co.'s champagnes in the United States, as appears from the papers before me, so far as any trade rights here were concerned, had nothing more than the right to sell, whilst the relationship with them lasted, G. H. Mumm Co.'s champagnes, manufactured and bottled by that firm in France, in bottles bearing on their labels one or other of the trade-marks above mentioned.

(4) That the manufacture of champagnes by G. H. Mumm & Co. was always confined to Rheims, France, that the trade-marks used on their bottles were never used to indicate a manufacturing origin for their contents elsewhere than in Rheims, and, consequently, that the good will of the firm, even if it may have been partly based on sales outside French territory, must have been founded on the reputation of Mumm champagnes radiating from Rheims, France, through the wine trade of the world, and, in a business of this kind, must have constituted a very important asset of the firm of G. H. Mumm & Co.

It is obvious that the sale of the properties and business of G. H. Mumm & Co. by the French liquidator could not have been effectual to pass to a purchaser the title of any part thereof which had not been seized and attached by the French sequestrator, and that the sequestrator could not have seized and attached any property tangible or intangible which did not have its situs in French territory.

The good will of a mercantile business such as that of G. H. Mumm & Co. might perhaps fairly be described as a form of incorporeal commercial property resulting from the trade hospitality of the customers of the business towards the purchase of whatever goods the business has to sell. The trade-names and trade-marks used by the business are merely credentials, protective labels of provenance, which assure its customers in respect of each purchase that their trade hospitality is not being abused. The result of fair dealing in this regard is a commercial friendship based on reciprocal confidence between a merchant and his customers.

In the United States, trade-marks exist independently of registration. The registration of the Mumm trade-marks in the United States, therefore, did not create the trade-marks, but was merely a convenient privilege, affording prima facie protection, which, on certain conditions, is allowed in this country to the foreign owner of the good will of a business, and which in the instant case was promptly availed of by the plaintiff in making application, as the new owner of the good will of G. H. Mumm

& Co., for the reregistration of the trademarks in its name.

It seems to me that the effect of the French sale of the good will of G. H. Mumm & Co., and, hence, of the trademarks of that firm in this country, turns on whether good will has a situs, and, if so, whether the situs of the good will of G. H. Mumm & Co. under the circumstances here shown was such as to make it subject to seizure and attachment in France.

I have been able to find only one case in which the question of the situs of good will seems to have been much discussed. That is the case of Commissioners of Inland Revenue v. Muller & Co.'s Margarine, Ltd., [1901] A. C. 217, affirming the decision of the Court of Appeal, [1900] 1 Q. B. 310, which involved the question as to the stamp taxes to be paid on a contract partly executed in England and partly in Holland for the sale of a German business with its good will. The House of Lords in that case dismissed the appeal of the Revenue Commissioner, and decided that, although the contract was partly executed in England, the stamp taxes to be imposed on it did not have to be calculated under the British Stamp Act on the basis of the value of the good will, because that had its situs outside of Great Britain, at the place of business of the company in Germany.

Lord Lindley in his speech for affirmance made some illuminating comments on good will in respect of the aspect of it now under consideration. At page 235 he said: "Goodwill regarded as property has no meaning except in connection with some trade, business or calling. In that connection I understand the word to include whatever adds value to a business by reason of situation, name and reputation, connection, introduction to old customers, and agreed absence from competition, or any of these things, and there may be others which do not occur to me. In this wide sense, goodwill is inseparable from the business to which it adds value, and, in my opinion, exists where the business is carried on. Such business may be carried on in one place or country or in several, and if in several there may be several businesses, each having a goodwill of its own."

At page 236 he said: "Goodwill is only taxable as property; and the legal conception of property appears to me to involve the legal conception of existence somewhere. Incorporeal property has no existence in nature and has, physically speaking, no locality at all. We, however, are dealing not with anything which in fact fills a portion of space, but with a legal conception, or, in other words, with rights regarded as property, but to talk of property as existing nowhere is to use language which to me is unintelligible."

The Muller Case was apparently a case of a somewhat more localized trade than is involved in the instant case, but it was a case like this of a manufacturing business maintained wholly in one place.

■ It seems to me quite clear that a manufacturer's good will must have a situs, and that such situs must be where his business is carried on. The situs of the good will of G. H. Mumm & Co., therefore, was at Rheims, France, where only the firm's business of making champagne was located.

I hold, therefore, that when the French sequestrator seized the properties and business of G. H. Mumm & Co. he seized the good will of the firm which was inseparable from the business and had its situs at the domicile of the business. Consequently, the sale of the business by the French liquidator to the plaintiff would have carried with it, even if they had not been specifically mentioned in the sale, all the good will of the business as a part thereof, and also the ownership of the trade-marks which were symbolic of that good will. Cf. President Suspender Co. v. Macwilliam, 238 F. 159, 162 (C. C. A. 2); Coca-Cola Bottling Co. v. Coca-Cola Co. (D. C.) 269 F. 796, 805, 806.

This theory of the situation herein was apparently the rationale of the decision of the Mixed Tribunal of October 24, 1921, and of the various orders made in the two subsequent decisions in an endeavor to enforce the present plaintiff's rights as against the former Mumm partners; and the same theory seems to be implicit in the rules laid down for matters such as are here involved in the Restatement of Conflict of Laws just issued by the American Law Institute, whereof the following sections seem apposite to this subject: Chapter 7, Property; topic 1, Property in General, § 212; topic 3, Movables, §§ 255 and 256.

The doctrine above suggested of the situs of the good will as affecting its seizure differentiates the instant case from the Chartreuse Cases (Baglin v. Cusenier Co., 221 U. S. 580, 31 S. Ct. 669, 55 L. Ed. 863, and Le Couturier et al. v. Rey et al.,

[1910] A. C. 262) and from the Ingenohl Cases (Ingenohl v. Olsen, 273 U. S. 541, 544, 47 S. Ct. 451, 71 L. Ed. 762, and Ingenohl v. Wing On Company [Shanghai] Ltd., 44 Reports of Patent Cases 343, 358, 359 [Privy Council 1927]).

In the Chartreuse Cases the French sequestrator, appointed under the French Association Act of 1901 which resulted in the dissolution of Order of Carthusian Monks in France, never succeeded in seizing the secret process under which the monks had manufactured Chartreuse, first, at their monastery "La Grande Chartreuse" near the Dauphiné Alps, in the Department of Isère, France, at Voiron, and, later, at Fourvoirie, close by Voiron. That secret was taken to Tarragona in Spain by the monks when they sought sanctuary there, and, hence, they took with them to their new domicile in Spain the good will of the business of manufacturing Chartreuse.

In the Ingenohl Cases, Ingenohl, who had had a successful business of manufacturing cigars at Manila, established a similar manufacturing business at Hong Kong, where he used the same trade-marks as he used in the Manila factory. Thus there was involved in the Ingenohl Cases the situation suggested in the above quotation from Lord Lindley in the Muller Case, [1901] A. C. 217, at page 265, wherein he said that if a business is carried on in several countries there may be several businesses each with its own good will. Under the Muller decision, the good will of each of such manufacturing businesses would have its situs in the country where such business was established. That, it seems to me, is the underlying philosophy which led Mr. Justice Holmes in Ingenohl v. Olsen to hold that the seizure by the Alien Property Custodian of the Ingenohl manufacturing business at Manila and his sale thereof did not carry any trade rights in Hong Kong due to the fact that there was a separate business in Hong Kong with its own good will there situate.

If Ingenohl's business had been a unitary business, such as we have in the instant case in respect of G. H. Mumm & Co., the decision of the Supreme Court may well have been different.

◼ VI. If I am wrong as to my theory that the situs of the good will underlay the decisions of the cases just discussed, there is another aspect of the situation which is equally controlling in the plaintiff's favor.

Although Mr. Justice Holmes held that the sale by the Alien Property Custodian in the Philippines did not affect a transfer of any trade rights in Hong Kong, he was careful to say, Ingenohl v. Olsen, 273 U. S. 541, at page 544, 47 S. Ct. 451, 452, 71 L. Ed. 762, "Of course a foreign state might accept the Custodian's transfer as good within its jurisdiction, if there were no opposing local interest or right."

Now, that is just what happened in the instant case, for our Executive Department, acting through our Patent Office, has recognized the sale by the French liquidator to the plaintiff herein and has allowed the plaintiff herein to register as owner of the business and good will of G. H. Mumm & Co. the trade-marks formerly registered as owned by G. H. Mumm & Co. as owner.

It is of interest to note here that the same result was also reached in England by the Comptroller General in an interference by the former Mumm partners on an application by the plaintiff herein to register the Mumm trade-marks in its name as owner. Cf. In the Matter of the Registered Trademarks 4172, 4174, 4181 and 42607 (Applications by G. H. Mumm & Company and by Société Vinicole de Champagne), 39 Reports of Patent Cases 379 (1922).

The decisions in the Mixed Tribunal and the award of the arbitrators in the Civil Arbitration above mentioned make it abundantly clear that the sale and transfer of the G. H. Mumm & Co. business with its appanages to the plaintiff herein by the French liquidator was valid under French law. Indeed, I do not understand that the validity of the sale is challenged by the defendant. As I understand it, only the question of the ambit of the sale is raised; that is, What property was transferred by it? On this question I think that the plaintiff here secured by the sale the full ownership of all the good will and trade-marks of G. H. Mumm & Co.

What it might have to do to protect such ownership in such good will and trade-marks in the different countries to which its trade extended is another question depending on the laws of such countries but not involved here. In this country the plaintiff followed up its position as owner of the Mumm good will and trade-marks by promptly securing the registration of the trade-marks here. Thus its situation has been fully regularized here for some time; indeed, the plaintiff has had some of the Mumm trade-marks registered in its name

since 1923 and others since 1928. For the reasons above stated, I think that its situation in this regard is unassailable.

VII. It follows from what I have said that my decision in respect of the several separate defenses must be as follows:

(A) The first defense, which is to the effect that the use of the name of G. H. Mumm & Co. is a fraud on the public here by the plaintiff, because no member of the Mumm family is in the plaintiff corporation and because the plaintiff only got such part of the business of G. H. Mumm & Co. as was located in France and its possessions, cannot, in my opinion, be made good here. For in Exhibit 1, annexed to the plaintiff's complaint, the plaintiff describes itself clearly as the successor of G. H. Mumm & Co., and it is perfectly obvious that on my theory of the case, leaving aside in respect of this defense the question of whether the defendant has any locus standi to raise it, an amendment would not assist the defendant. Therefore, the motion to strike out the first defense is granted without leave to amend.

(B) The second separate defense alleges that there was fraud in securing registration of certain of the trade-marks in the plaintiff's name because in the applications it was stated that the applicant had used the trade-marks for ten years preceding February 20, 1905, which was obviously impossible as it was not formed until circa 1920. As I stated above, a motion of this kind opens up the record and the court may look back to the complaint for strength as well as for weakness. Here the assignments on file in the Patent Office detailing the circumstances by which the plaintiff claims to have achieved the ownership of the former G. H. Mumm & Co. trade-marks negatives any fraud in obtaining their registration in the plaintiff's name, and relegates the statement in the applications on which the defendant makes its attack to the status of an obvious and innocent error.

Therefore, again leaving aside the question of the defendant's locus standi, the motion to strike out the second separate defense is granted without any leave to amend.

(C) In dealing with the three other defenses, the defendant is, for the reasons hereinabove stated, faced with the necessity of showing some juridical connection with the situation to give it any locus standi. The defendant is described as a corpora-tion of New York, organized September 29, 1933, with Walther von Mumm as its principal owner and president, but that does not give it any locus standi to maintain the third or the fifth defense or the counterclaim.

In dealing with the third and fifth defenses and with the counterclaim I hold that even if the defendant could make out a locus standi, in view of my opinion as to the law, to allow an amendment would be futile, and, therefore, the third and fifth separate defenses and the counterclaim are stricken out without leave to amend.

(D) With regard to the fourth defense, I grant the motion to strike out, but I give leave to amend.

I think that the infirmity in the fourth defense is that the defendant does not allege what the true name of Walther von Mumm is. I think it is not sufficient to plead as the defendant has done, that Walther von Mumm is a direct descendant of the founder of the original G. H. Mumm & Co. I think the defendant must allege what the true name of Walther von Mumm is. In order to give the defendant an opportunity to do this, I give it leave to amend the fourth separate defense within twenty days, but if it fails to do so the fourth defense also will be finally stricken out.

Settle order on notice.