John ZWACK, Bela Zwack and Dora Zwack, as co-partners doing business as J. Zwack & Company, Appellees,

v.

KRAUS BROS. & CO., Inc., Appellant.

No. 349, Docket 23931.

United States Court of Appeals Second Circuit.

Argued June 5, 1956.

Decided Oct. 2, 1956.

Paul L. Ross, Wolf, Popper, Ross, Wolf & Jones, New York City, for appellant.

George A. Spiegelberg, Strasser, Spiegelberg, Fried & Frank, New York City (Peter J. Ryan, New York City, of counsel), for appellee John Zwack.

Otto C. Sommerich, Katz & Sommerich, New York City (Benjamin Busch, New York City, of counsel), for appellees Bela Zwack and Dora Zwack.

Before CLARK, Chief Judge, and HINCKS and WATERMAN, Circuit Judges.

HINCKS, Circuit Judge.

This is an appeal from a decree entered in the Southern District of New York in favor of plaintiffs [1] in an action for the collection of a pre-existing indebtedness and for damages and an accounting of damages and profits resulting from trade-mark infringement and unfair competition. The defendant's appeal not only challenges the decree on its merits but also assigns as errors various rulings on evidence and two preliminary orders, viz., (1) denying its motion to dismiss for failure to join indispensable parties, and (2) granting plaintiffs' motion to bar the defendant from transmitting John Zwack's pre-trial deposition to Hungary. The decree was entered on October 6, 1950 upon an opinion by Judge Palmieri reported in 133 F.Supp. 929. Contemporaneously, findings of fact and conclusions of law were filed which have not been published.

The plaintiffs allege themselves to be partners owning the Hungarian firm, J. Zwack & Co., a manufacturer and exporter of liqueurs, which, they contend, on or about November 18, 1948, was confiscated by the Hungarian government, now the registered owner of the firm in Hungary. The defendant is a New York corporation which since 1934 has been the exclusive distributing agent for J. Zwack & Co. in the United States under an agreement and extensions thereof running until 1960.

During the course of the war in Europe, commerce under the agreement was suspended and funds which were owed by defendant to the Zwack firm were blocked in the United States. At the close of the war amicable business relations were again established. Shortly before the alleged confiscation in 1948, the plaintiff, John Zwack, fled from Hungary and immediately thereafter notified the defendant not to deal with the firm under its new confiscatory ownership. By agreement with the pre-confiscated firm, the defendant had registered in its name in the United States certain trade-marks bearing the name of the Zwack firm.

The judge, in his conclusions of law, ruled in substance

(1) that in 1948 the plaintiffs' plant, assets and business in Hungary had been "nationalized" by the Hungarian government without consideration and by coercion and duress; and that the nationalization

1. Originally this action was brought by John Zwack and Bela Zwack in behalf of the firm, J. Zwack & Co. Dora Zwack was named a plaintiff by amendment. Bela Zwack and his wife Dora, by letters from Hungary, at first disassociated themselves from the suit but Judge Palmieri disregarded these letters as coerced. Subsequently Bela and Dora left Hungary and on motion before this court they were granted the right to appear as parties plaintiff to the action. The action came to the court below by removal from a New York state court.

"offends the morals and violates the public policy of the United States and will be given no extra-territorial effect in the United States by the courts of the United States";

(2) that the situs of moneys which became due from the defendant to the plaintiffs in 1940 and the situs of certain trade-marks registered in the United States Patent Office and elsewhere in the United States by and in the name of the defendant while acting as the agent of the plaintiffs in the United States, was in the United States;

(3) that "the continuance of business relations with the Hungarian Government" after the confiscation and notice thereof to the defendant was "a breach of its exclusive agency agreement with the plaintiff" and "was a wrongful act of defendant for which it is accountable to the plaintiff";

(4) that it was also unlawful for the defendant after notice of the confiscation to continue to import and sell in the United States goods bearing the plaintiffs' name, trademarks and labels;

(5) that "plaintiff was in a position to manufacture in and/or import Zwack products into the United States"[2] and "had arranged for the necessary financing therefor,"[3] and that the defendant's use, after notice of the expropriation of plaintiffs' name and label made it impossible for plaintiffs to manufacture in or import into the United States;

(6) that the plaintiff was entitled to a decree

(a) for the moneys ($17,685.56) which had become due from the defendant in 1940;

(b) to damages resulting from its inability to manufacture in the United States after December 7, 1948;

(c) to an accounting of such profits made by the defendant subsequent to December 7, 1948 as were due to defendant's unfair competition and trade-mark infringement;

(d) to an injunction restraining defendant from the use of plaintiffs' name, trade-name, trade-marks and bottle shapes;

(e) to a mandatory injunction directing the defendant to assign to the plaintiffs certain trade-marks registered by the defendant in its name in the United States.

The decree accorded the plaintiffs all the relief to which by Conclusions 6(a) to 6(e), inclusive, just above stated, they were held to be entitled. It also referred the case to the Master to find and report as to the plaintiffs' alleged damages (6(b), supra) and the defendant's profits (6(c), supra).

Before we can deal with the merits of the controversy we must dispose of a serious question concerning the plaintiffs' standing to bring this suit. Under applicable Hungarian law, which regards a partnership as an entity, the individual partners have no individual rights in the firm assets. Therefore, the plaintiffs' standing to sue can only be based on their claims to sue as partners in behalf of the firm. The defendant seeks to analogize the Hungarian entity concept of the partnership to the American concept of the corporation and argues that the partner's interest in the firm assets consists wholly of a claim of ownership in the firm having its exclusive situs at the firm residence in Hungary. It urges that the transfer of the plaintiffs' shares of ownership was accomplished in Hungary by official acts of the Hungarian government and therefore is not subject to collateral attack outside of Hungary even if confiscatory and therefore against the public policy of the forum. They cite Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42

2. This conclusion does not state the date on which the plaintiffs became able to manufacture in the United States.

3. Finding 51 recites that "In 1950, the plaintiff * * * had procured financial backing for the manufacture of Zwack liqueurs * * *."

L.Ed. 456; Banco de Espana v. Federal Reserve Bank, 2 Cir., 114 F.2d 438; and Bernstein v. Van Heyghen Freres Societe Anonyme, 2 Cir., 163 F.2d 246, 249. In reliance on this doctrine the defendant contends that the plaintiffs have no standing to sue and the action should have been dismissed.

The plaintiffs base their claim of right to challenge Hungarian ownership of firm assets in the forum on the doctrine that foreign acts of confiscation are presumed to be against the public policy of the forum, Plesch v. Banque Nationale de la Republique D'Haiti, 273 App.Div. 224, 77 N.Y.S.2d 43, affirmed 298 N.Y. 573, 81 N.E.2d 106, and will not be given extraterritorial effect, Baglin v. Cusenier Co., 221 U.S. 580, 31 S.Ct. 669, 55 L.Ed. 863; Ingenohl v. Walter E. Olsen & Co., 273 U.S. 541, 47 S.Ct. 541, 71 L.Ed. 762; United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141; Vladikavkazsky Ry. Co. v. New York Trust Co., 263 N.Y. 369, 189 N.E. 456, 91 A.L.R. 1426, absent a treaty or other indication of a public policy to do so, United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796; United States v. President and Directors of Manhattan Co., 276 N.Y. 396, 12 N.E.2d 518. Thus their argument runs that even if Hungarian ownership of the firm is conclusive as to the firm assets in Hungary, the issue of firm ownership is open to collateral inquiry in the United States courts where firm assets having a situs in the forum are concerned.

We think that, where firm assets existing in the forum are concerned, technical considerations as to the manner in which the foreign state seeks to expropriate them are not controlling. Prior to confiscation the assets of the firm both here and in Hungary were equitably owned by the plaintiffs as the sole partners in the firm. It is clear that the Hungarian government could not directly seize the assets which have a situs in the state of the forum. To allow it to do so indirectly through confiscation of firm ownership would be to give its decree extraterritorial effect and thereby emasculate the public policy of the forum against confiscation. This we decline to do. See 57 Yale Law Journal 108. We sustain the plaintiffs' standing to bring and prosecute the complaint here involved.

■■ We next turn to the pre-trial order reported at D.C., 93 F.Supp. 963, 965, which denied the defendant's motion to dismiss for failure to join Bela Zwack, Dora Zwack, the Hungarian government and the "'presently existing firm of J. Zwack & Company of Budapest, Hungary'" as indispensable parties.[4] Since Bela and Dora Zwack have since appeared as parties plaintiff by leave of this court we need only examine whether the Hungarian government, as the sole owner of the nationalized firm, is an indispensable party to this action.

It is clear that the Hungarian government is not subject to the jurisdiction of the court below unless it should voluntarily appear. To hold that its joinder is indispensable to the maintenance of this action would not only deprive the plaintiffs of any remedy, a result which a court will properly strain to avoid,[5] but would effectively accomplish for the confiscating government precisely what we hold it cannot do, i. e., confiscate at will assets having a situs within this country. The decree below did not purport to adjudicate rights between the plaintiffs and the Hungarian government either in Hungary or in the United States but merely settled rights between the parties to the suit as to the property located in the United States. At most it made a preliminary decision of issues between the plaintiffs and the Hungarian government in order to determine the question of the plaintiffs' standing to sue. If that government had desired to intervene in the action on those issues it

---

4. In another pre-trial order reported at D.C., 97 F.Supp. 719, the plaintiffs' motion for a preliminary injunction was denied.

5. See Bourdieu v. Pacific Western Oil Co., 1936, 299 U.S. 65, 70, 57 S.Ct. 51, 81 L.Ed. 42.

could have done so. It had sufficient actual notice for that purpose through its agent in the United States, the defendant. We hold that the Hungarian government was not an indispensable party.

The defendant also assails a pretrial order by Judge Dimock precluding it from transmitting to Hungary five questions and answers in John Zwack's pretrial deposition relating to bribery of Hungarian Communist officials by him and Bela Zwack. The parties, by stipulation, had agreed not to send these questions and answers to Hungary before obtaining a ruling from the court. The court ruled that pursuant to the provisions of Rule 30(b), Federal Rules of Civil Procedure, 28 U.S.C.A., justice required that the questions and answers not be sent to Hungary, presumably because of the resultant consequences to Bela Zwack who at that time was still in Hungary. The defendant was left free to carry on investigations in Hungary as to the acts or transactions to which John Zwack's participation therein was not revealed.

Rule 30(b) gives the trial court broad discretionary control over the scope and method of discovery by oral deposition. The concluding grant of discretionary power in the rule states that "the court may make any other order which justice requires to protect the party or witness from annoyance, embarrassment, or oppression." We think that the interest of the witness John Zwack in the safety of his brother, Bela Zwack, in the extraordinary circumstances of this case would have been sufficient to justify an order precluding the defendant from examining John as to Bela's participation in the alleged bribery transactions on the grounds of oppression. Here, it is true, the order was applied for after the deposition had been taken but we think the motion was properly saved by the stipulation. In any event the order was not materially prejudicial to the defendant since it remained free to examine any of the named persons in Hungary concerning any of the transactions referred to

so long as it did not reveal the precluded five questions and answers of John Zwack.

The appellant assigns error on the ruling of the court that defendant's Exhibits WW and YY were inadmissible. These were certifications by Hungarian officers purporting to show surplus profits tax due from the firm prior to November 1948. It appears that they comprised answers to unilateral interrogatories and not "document[s] of record or on file in a public office of a foreign country * * * certified by the lawful custodian thereof". Cf. 28 U.S.C.A. § 1741. Since they purport to evidence the truth of the verbal matter asserted therein and do not evidence a recorded act, they fall within the hearsay rule and were properly excluded. United States v. International Harvester Co., 274 U.S. 693, 703, 47 S.Ct. 748, 71 L.Ed. 1302; cf. Vanadium Corp. of America v. Fidelity & Deposit Co., 2 Cir., 159 F.2d 105. But even if technically the documents were admissible, the ruling would not constitute reversible error. The effect of this evidence would have been for the court to decide and in its opinion the court properly observed that it considered similar documents of slight evidentiary weight.

We come now to the central issue in the case. It is essentially an issue of fact, viz., did the Hungarian government, as the plaintiffs contend, confiscate the plaintiffs' business with the appurtenant trade-marks legally or equitably owned by the plaintiffs? Or, did the Hungarian government, as the defendant contends, acquire the plaintiffs' business and trade-marks through a voluntary sale thereof by the plaintiffs? This issue the court below found favorably to the plaintiffs. We cannot say that the finding was clearly erroneous. There was evidence that in making any nominal transfer of the business to the government the Zwacks were actuated by coercion and fear of political reprisals. The evidence amply supported the finding that there was no substantial consideration for a transfer and that even the nominal

consideration was not actually and wholly delivered. It is conceded that since late 1948 the Hungarian government has assumed to act as owner of the business. Whether its claimed ownership resulted from "confiscation," or from a "nationalization" of the business, or from "expropriation" is not important for present purposes. And we may assume for all present purposes that the Hungarian government has the right and power to enforce its title to assets of the business located in Hungary and its right to the use of the appurtenant trade names and marks in Hungary.

■ But even so, it does not follow that courts in this country must recognize Hungarian claims of title to property situated in this country or rights with respect to commerce in this country which were acquired only by coercion practiced on the owners without substantial consideration. On the facts of this case we think Judge Palmieri was right in his refusal to recognize rights to trade names so derived and in treating the plaintiffs as the equitable owners. The governing principles are set forth in Baglin v. Cusenier Co., supra. See also Lecounturier v. Rey [1910] A.C. 262; Plesch v. Banque Nationale de la Republique D'Haiti, supra; United States v. Pink, supra; Ingenohl v. Walter E. Olsen & Co., supra; Bernstein v. N. V. Nederlandsche-Amerikaansche, etc., 2 Cir., 210 F.2d 375, modifying, 2 Cir., 173 F.2d 71; 57 Yale Law Journal 108. There was neither a finding nor evidence to support a finding that the plaintiffs had abandoned their trade-marks and names. Cf. Beech-Nut Packing Co. v. P. Lorillard Co., 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810. We agree with him that Societe Vinicole de Champagne v. Mumm Champagne & Importation Co., D.C., 10

F.Supp. 289; Id., D.C., 13 F.Supp. 575, is distinguishable and not to the contrary.

We conclude that the injunctive relief accorded to the plaintiffs was rightly granted.

■ This brings us to a troublesome question of appellate jurisdiction. The parties assume that the principal order appealed from is a final order supporting appellate jurisdiction under 28 U.S.C.A. § 1291. Although the question is not entirely free from doubt, we conclude that the reference to a special master for an accounting of profits and damages rendered the entire order interlocutory.[6] Nevertheless, the portions of that order which constituted injunctive provisions are appealable under 28 U.S.C.A. § 1292 (1), including the mandatory injunction to assign the "Zwack" trade-marks. Habirshaw Electric Cable Co. v. Habirshaw Electric Cable Co., 2 Cir., 296 F. 875, 878. We may also review the denial of the motion to dismiss for failure to join indispensable parties since if that motion was erroneously denied the cause must be dismissed and the appeal from the injunctions would become moot. Cf. Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189; Chicago, Rock Island & Pacific R. Co. v. Stude, 346 U.S. 574, 578, 74 S.Ct. 290, 98 L.Ed. 317; Riverbank Laboratories v. Hardwood Products Corp., 7 Cir., 220 F.2d 465, 466; Pang Tsu Mow v. Republic of China, 91 U.S.App.D.C. 324, 201 F. 2d 195, 198, certiorari denied 345 U.S. 925, 73 S.Ct. 784, 97 L.Ed. 1356. And since the injunctions appealed from were permanently issued on the merits we must examine the merits of the case, including the trial court's pre-trial motion limiting the defendant's right of discovery and

6. George v. Victor Talking Machine Co., 293 U.S. 377, 55 S.Ct. 229, 79 L.Ed. 439; Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189; Rexford v. Brunswick-Balke-Collender Co., 228 U.S. 339, 345–346, 33 S.Ct. 515, 57 L.Ed. 864; Guarantee Co. of North America v. Mechanics' Savings Bank & Trust Co., 173 U.S. 582, 19 S.Ct. 551, 43 L.Ed. 818; Latta v. Kilbourn, 150 U.S. 524, 14 S.Ct. 201, 37 L.Ed. 1169; Parsons v. Robinson, 122 U.S. 112, 7 S. Ct. 1153, 30 L.Ed. 1122. Cf. Larsen v. Wright & Cobb Lighterage Co., 2 Cir., 167 F.2d 320, 323; Pang-Tsu Mow v. Republic of China, 91 U.S.App.D.C. 324, 201 F.2d 195, 197; see 6 Moore's Federal Practice, ¶54.12.

**262.**

its ruling at the trial on admissibility of evidence.[7]

However, we lack appellate jurisdiction at this time to review the portion of the order awarding the plaintiffs funds blocked during the war, Leonidakis v. International Telecoin Corp., 2 Cir., 208 F.2d 934, and referring the case to a special master for a determination of profits and damages. Sheldon v. Moredall Realty Corp., 2 Cir., 95 F.2d 48; Chadeloid Chemical Co. v. H. B. Chalmers Co., 2 Cir., 243 F. 606, 610; Lederer v. Garage Equipment Mfg. Co., 7 Cir., 235 F. 527; Racine Engine & Machinery Co. v. Confectioner's Machinery & Mfg. Co., 7 Cir., 234 F. 876; Metallic Extraction Co. v. Brown, 8 Cir., 104 F. 345.

Even if it could properly be held that under the doctrine of Forgay v. Conrad, 6 How. 201, 12 L.Ed. 404, we would have appellate jurisdiction to review the plaintiffs' right to accounting of the defendant's profits as an incident to the injunctive provisions of the decree, had the complaint sought no further relief,[8] the fact remains that the complaint also put in issue two independent claims for legal damages, viz., the plaintiffs' right to damages for tortious interference with its trade name and marks and their right to recover the moneys accrued prior to the war. Thus indisputably the action was one for the prosecution of multiple claims and there is in the record no certificate by the judge below that "there is no just reason for delay" in entering a final judgment on these two legal claims, as required by Rule 54(b). Indeed it may be doubted that the judge had power, by such a certificate, to invest with the attributes of appealable finality an order that the plaintiffs were entitled to damages when by the same order he reserved jurisdiction, after an accounting to be

held before a special master, to ascertain the amount of such damages.[9]

It follows, we hold, that although all our rulings indicated above are within our jurisdiction under 28 U.S.C.A. § 1292 (1) as necessarily involved in the right to the injunction provisions of the decree appealed from, such portions of the decree as adjudicate the plaintiffs' rights to damages and to an accounting are not reviewable at this stage. Accordingly, at this stage we affirm only in part. More specifically, of the conclusions of law made by the court below we affirm only those summarized above in this opinion as Conclusions (1), (2), (4), (6(d)) and (6(e)).[10]

To give further definition to the scope of the adjudications made on this appeal we will add that for lack of the finality of portions of the decree below we do not now pass upon the plaintiffs' right to damages on any portion or on any theory of their claims therefor. Nor do we now pass upon their right to an accounting of the defendant's profits *made after December 7, 1948.* Our disposition of this appeal leaves these questions still within the jurisdiction of the court below for determination on such further proceedings as the judge shall deem appropriate.

As to the plaintiffs' right to damages we will observe, however, that we find it difficult to understand, at least on the findings and conclusions thus far made, how the plaintiffs have any right to damages accruing after 1948 based on *breach of contract.* Under the underlying agency contract, was not the defendant's obligation subject at least to the implied condition that the plaintiffs' ability to perform by the manufacture and export of liqueurs would continue without any substantial lapse? If that be so, would it not follow that the plaintiffs' apparently

7. Doeskin Products v. United Paper Co., 7 Cir., 195 F.2d 356, 360–361, is inapplicable since that case dealt with the scope of an appeal from an interlocutory order granting a preliminary injunction prior to trial on the merits.

8. Cf. 6 Moore's Federal Practice, ¶54.13.

9. Cf. 6 Moore's Federal Practice, ¶54.32.

10. Throughout this opinion numerical references to the Conclusions below are those used in the summary thereof set forth in the fore part of this opinion, which obviously do *not* correspond with the numerical references carried in the text of the conclusions and decree as filed below.

undisputed inability to perform at least from 1948 to 1950, whether caused by "confiscation" or by contractual coercion, constituted a failure of consideration and thus operated to discharge the defendant from all contractual obligations thereafter arising? Cf. Corbin on Contracts, §§ 1351, 1363, 1365. If so, it would seem to follow that the defendant is not liable for *breach of contract* resulting from its post-confiscation conduct. Moreover, we have serious doubt as to the adequacy of findings thus far made and as to the existence of legal sanction to support the holding below (noted as 6(b) in this opinion) that the plaintiffs are entitled to damages resulting from inability to manufacture in the United States after *December 7, 1948*. It is hard for us to understand how the plaintiffs can be entitled to the defendant's profits (via the accounting to which we hold them entitled) and, in addition, to damages comprising their own lost profits *for the same period.* Surely convincing evidence would be required to support a finding that the plaintiffs, if not obstructed by wrongful conduct by the defendant, on starting manufacture in the United States from scratch would have made profits larger than those achieved by the defendant with all its years of experience in the American market. It should be understood that the foregoing comment on the issue of damages is made not to indicate final appellate rulings (indeed, as noted, at this stage we lack appellate jurisdiction to make such rulings) but for the assistance of court and counsel in suitably developing the subject-matter in the proceedings on remand.

We think we should also explain our unwillingness now to affirm Conclusion (6(c)), as denominated above. From the affirmance of Conclusion of Law (4), it necessarily follows that the plaintiffs are entitled to an accounting: but not necessarily that the accounting period begins as early as December 7, 1948 as was provided by Conclusion (6(c)) as covered into the decree below. We wonder if it was not by inadvertence that the accounting was ordered to begin as of De-

cember 7, 1948 (when a cryptic and hardly intelligible cable was sent to the defendant from Vienna) instead of the date of receipt of a letter from John Zwack sent from Rome under date of December 23, 1948 (which carried unequivocal assertion that the Zwack business had been nationalized). However that may be, we leave it open to the judge below to fix the date of the accounting period and, upon proper findings and recommendations by the master, to determine the recoverable profits.

Affirmed in part and remanded for further proceedings.