CARL ZEISS STIFTUNG, doing business under the name and style of Carl Zeiss; and Zeiss Ikon A.G., Plaintiffs,

v.

V. E. B. CARL ZEISS, JENA; Steelmasters, Inc.; Ercona Corporation; Exakta Camera Company, Inc.; and Camera Specialty Company, Inc., Defendants,

Carl Zeiss, Inc., Additional Defendant on Counterclaims.

No. 62 Civ. 850.

United States District Court
S. D. New York.

Nov. 7, 1968.

Milbank, Tweed, Hadley & McCloy, New York City, for plaintiffs and Carl Zeiss, Inc., William E. Jackson, Isaac Shapiro, Patrick Owen Burns, Walter J. Derenberg, of Von Maltitz, Derenberg, Kunin & Janssen, New York City, of counsel.

Harry I. Rand, New York City, for defendants V.E.B. Carl Zeiss Jena, Steelmasters, Inc., and Ercona Corp., Donald E. Nawi, David Kremen, Hays, Sklar & Herzberg, and Warren F. Schwartz, New York City, of counsel.

## DISCUSSION

MANSFIELD, District Judge.

■■ A central and primary issue in this case is whether the plaintiff Foundation or that established in East Germany in 1951 is legally identical with, and the successor to, the original Abbe Foundation, which is without question entitled to exclusive use of the United States trademarks in dispute. The Soviet expropriation purported to encompass all Zeiss trademarks owned by the Zeiss firm, wherever located. In view of the well-settled United States policy against extraterritorial recognition of such decrees, the Foundation or its legal successor, if it has legally continued to exist (whether in East Germany, West Germany, or elsewhere [1]), must be recognized as the owner of the United States marks. Furthermore, while a United States court may give effect to expropriation of property located within the territory of the expropriating state, Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), United States trademarks, for the purpose of determining the applicability of our anti-expropriation policy, are deemed to be located within the United States, even though the trademarked goods may be manufactured elsewhere, Zwack v. Kraus Bros. & Co., 237 F.2d 255 (2d Cir. 1956); F. Palicio y Compania, S.A. v. Brush, 256 F.Supp. 481 (S.D.N.Y.1966); and see Baglin v. Cusenier Co., 221 U.S. 580, 596, 31 S.Ct. 669, 55 L.Ed. 863 (1911), and our anti-expropriation policy applies with full vigor with respect to property outside the taking state. As Judge Friendly said

[1]. Defendants' contention that one of the United States trademarks involved, "Carl Zeiss Jena", is so closely identified with the city of Jena as to characterize articles bearing it as produced there, and hence inseparable from Jena, requires little comment. The proof reveals no such geographical connotation. It is doubtful whether most American buyers know the location of Jena, and defendants concede that such buyers would not associate the name with a Foundation. Since the Foundation for years prior to 1945 had manufacturing facilities outside of Jena, the quality of its products did not depend on manufacture in a particular location. In any event, a geographical connotation would not affect the issue of ownership.

in a learned opinion in Republic of Iraq v. First Natl. City Bank, 353 F.2d 47, 51 (2d Cir. 1965):

> "Extra-territorial enforcement of the Iraqi ordinance as to property within the United States at the date of its promulgation turns on whether the decree is consistent with our policy and laws. [Footnote omitted] We perceive no basis for thinking it to be. Confiscation of the assets of a corporation has been said to be 'contrary to our public policy and shocking to our sense of justice.' Vladikavkazsky Ry. Co. v. New York Trust Co., 263 N.Y. 369, 378, 189 N.E. 456, 460, 91 A.L.R. 1426 (1934)."

█ Since the objective of our policy is to prevent the unfair consequences of expropriation without compensation, we are required as a counterpart of that policy, insofar as it is possible to do so, to identify the owners surviving the confiscation, and to award the property to them. In this case, therefore, since the Soviet's purported expropriation of the United States Zeiss trademarks violated our anti-expropriation policy, leaving the Foundation's ownership unaffected, our task is to identify the surviving owner as between the various claimants.

If the issue of legal identity or successorship, which is central to the case, could be resolved solely as a question of fact, the facts found by the Court would dictate a decision in favor of the plaintiff as the true Zeiss Foundation. The evidence reveals that as between the rival Foundations, the plaintiff is in fact a good faith continuation of the original Abbe organization, in which the Zeiss officers employed for life who were the official representatives of the original Foundation have conscientiously done everything within their power to adhere to the Abbe Statute and carry on the tradition of the organization, to the extent that this has been permitted by circumstances beyond their control (i. e., their forced evacuation from Jena to Heidenheim, and their inability, after two years of efforts, to maintain the organization at Jena, even at the price of forebearing exercise of their own authority, after Soviet seizure of its assets there). The "Foundation" established in 1951 in East Germany, in contrast, is but a sham and subterfuge, erected solely for the purpose of litigation outside of East Germany, and neither a continuation of the original organization nor a good faith effort to resurrect it in substance or adhere to its basic tenets.

If fundamental fairness and equity were the criteria, therefore, the de facto existence and operation of the plaintiff Foundation in the West as a good faith effort to continue what remained of the overall Abbe Foundation enterprise, after expropriation of its assets in the East and its inability to function in its original domicile, would call for its recognition. Such an approach based on the equities was adopted by the United States Supreme Court more than 50 years ago in a remarkably parallel situation in Baglin v. Cusenier Co., 221 U.S. 580, 31 S.Ct. 669, 55 L.Ed. 863 (1911), which involved the trademarks to the well known liqueur "Chartreuse." For many years the liqueur had been manufactured by the order of Carthusian Monks in a monastery in France known as the "Grande Chartreuse" and sold throughout the world (including the United States) under the trademark "Chartreuse." In 1903 the monastic order was dissolved by French law and its property confiscated. Thereupon the Monks moved to Spain where they resumed manufacture of the same liqueur there. In the meantime a French company, as liquidator, continued operation of the expropriated monastery and factory in France. The Supreme Court granted the refugee Monks an injunction against use of the trademark in the United States by the liquidator and his distributor, holding that the Monks were legally identical with the original monastic order and that to permit the defendants to use the marks in the United States would allow the French Government to seize United States trademarks·

and detach them from the Monks' product. In denying effect to an extraterritorial expropriation by a foreign power that would violate American policy, the court was prepared to overlook technical niceties in favor of doing substantial justice on the basis of the equities.

The fashioning of such a doctrine of equitable ownership as a counterpart of our anti-expropriation policy is frequently dictated by necessity, since expropriation usually changes the expropriated enterprise, sometimes so drastically that recognition of the survivors or their successors becomes difficult. Where the ownership of a natural person is involved (such as the expropriation of King Faisal's United States assets by the Republic of Iraq), the inquiry is a relatively simple one, the property being awarded to his estate or heirs upon his death. Republic of Iraq v. First Natl. City Bank, 353 F.2d 47 (2d Cir. 1965). Where a creature of the law, such as a partnership or corporation, is concerned, however, the inquiry into its life, death and succession is more complex. As Judge Cardozo said in Petrogradsky M. K. Bank v. National City Bank, 253 N.Y. 23, 30, 170 N.E. 479, 481 (1930):

"There is a distinction not to be ignored between the life of a human being and the life of a *persona ficta,* the creature of the state. When a human being dies, his death is equally a fact whether it is brought about legally or illegally, whether he has died of illness in his bed or has been murdered on the highway. The event is not conditioned by the juristic quality of the cause. But in respect of juristic beings, the quality of the cause may determine the event as well. The personality created by the law may continue unimpaired until law rather than might shall declare it at an end. Conceivably, the law *will* declare it at an end when marauders have brought frustration to the purpose for which personality was given. That is another question. What is not to be lost. sight of is that even so it is the law

and not merely an assassin that must pronounce the words of doom."

■ The legal existence, status, identity, and domicile of a foreign corporate entity or juristic personality, such as the Foundation here, must be determined by the laws of the country where it has been created and continues to exist, see Bank of Augusta v. Earle, 13 Pet. 519, 10 L.Ed. 274 (U.S.Sup.Ct.1839); Russian Reinsurance Company v. Stoddard, 240 N.Y. 149, 147 N.E. 703 (1925). Procedural technicalities, lack of clarity in the foreign law involved, or doubt as to its applicability, however, should rarely be viewed as insurmountable obstacles, particularly where United States property is at stake, since failure to resolve the issue would reward the oppressor, give effect to fundamentally unfair acts, or result in the property becoming "ownerless". Expropriation without compensation is an extraordinary and basically unfair measure, frequently resulting in unusual consequences not provided for in the laws of the country where the owner was established, which often assume continuation of governmental institutions according to an existing pattern rather than substitution of drastic new concepts. As a result our courts have developed a willingness to disregard technicalities in favor of equitable considerations. For instance in Zwack v. Kraus Bros. & Co., 237 F.2d 255 (2d Cir. 1956), the Court, faced with similar problems arising out of the expropriation of a Hungarian ownership, stated:

"Under applicable Hungarian law, which regards a partnership as an entity, the individual partners have no individual rights in the firm assets. * * * The defendant seeks to analogize the Hungarian entity concept of the partnership to the American concept of the corporation and argues that the partner's interest in the firm assets consists wholly of a claim of ownership in the firm having its exclusive situs at the firm residence in Hungary. It urges that the transfer of plaintiffs' shares of ownership was accomplished in Hungary by official

acts of the Hungarian government and therefore is not subject to collateral attack outside of Hungary even if confiscatory and therefore against the public policy of the forum.

\* \* \* \* \* \*

"We think that, where firm assets existing in the forum are concerned, technical considerations as to the manner in which the foreign state seeks to expropriate them are not controlling. Prior to confiscation the assets of the firm both here and in Hungary were equitably owned by the plaintiffs as the sole partners in the firm. It is clear that the Hungarian government could not directly seize the assets which have a situs in the stage of the forum. To allow it to do so indirectly through confiscation of firm ownership would be to give its decree extraterritorial effect and thereby emasculate the public policy of the forum against confiscation. This we decline to do." 237 F.2d at 258–259.

Similarly, in a case involving an Estonian corporation, A/S Merilaid & Co. v. Chase Natl. Bank, 189 Misc. 285, 71 N.Y.S.2d 377 (Sup.Ct.N.Y.County 1947), a majority of whose stockholders met in Sweden following expropriation and purported to transfer the corporate seat to Sweden and re-elect former directors with authority to continue the business, such action, notwithstanding irregularities, was regarded as effective to continue the corporate existence and entitle the surviving entity to funds deposited in a New York bank. The irregularities in procedure were disregarded because "all that could be done to conform with the usual formalities was done". 71 N.Y.S.2d at 379. Where a juristic entity or personality created by one state has been recognized by other states, which permit it to "do business" in their respective territories (owning property, making contracts, etc.) so that it assumes a status as an international business organization, no sound reason appears, in fairness or logic, why termination of its existence in the creating state, and purported seizure of its assets

without compensation, should require those other states where its property is located to treat its existence as terminated everywhere rather than assume sponsorship or recognition of the entity as continuing to exist within their borders. Permission to "do business" would appear as a matter of international law, to carry the implied condition that the entity be treated as continuing for certain purposes within the state granting such permission.

With these principles in mind we turn to consideration of the law of the country in which the Zeiss Foundation was created. See page 898, supra, Bank of Augusta v. Earle, 13 Pet. 519, 10 L.Ed. 274 (U.S.Sup.Ct.1839); Russian Reinsurance Company v. Stoddard, 240 N.Y. 149, 147 N.E. 703 (1925). Both sides describe that law as "German law," which accords with the view that at least until September 1949, when the Federal Republic of Germany (West Germany) was formed, Germany continued to exist legally as a sovereign state occupied by four hostile powers which, through the Allied Control Council, administered it. Clark v. Allen, 331 U.S. 503, 514, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947); State of Netherlands v. Federal Reserve Bank, 201 F.2d 455 (2d Cir. 1953). The parties differ sharply, however, as to whether the German law is that promulgated and interpreted by West Germany, or by East Germany. Plaintiffs argue that the former must be recognized as the only law of Germany for the reason that the United States Government, through its Executive Branch, recognizes the Government of the Federal Republic of Germany (West Germany) as the only German Government freely and legitimately constituted and entitled to speak for Germany (Policy Statement of U.S., France and U.K., September 19, 1950, 23 Dept. of State Bull. 530 (1950)), and does not recognize the existence of the German Democratic Republic (East Germany) or any other separate state or sovereign in the Soviet Zone. See Moscow Fire Insurance Co. v. Bank of New York, 280 N.Y. 286, 20 N.E.2d 758

(1939); Petrogradsky M.K. Bank v. National City Bank, 253 N.Y. 23, 170 N.E. 479 (1930).

In the plaintiffs' view the governing body of German law encompasses the law of the German Reich (including its Constitution and the German Civil Code in effect from the termination of hostilities until the formation of West Germany in 1949); the acts of the Control Council for Germany, of the Occupying Powers in the West, and of the governments of the various German laender or states in the West; the Constitution of West Germany and decisions of its courts; and the laws in effect in the Soviet Zone to the extent that they do not violate the public policy of West Germany.

Defendants, on the other hand, contend that our Government's non-recognition of East Germany does not preclude application of East German law, at least where it is the *de facto* govennment of that territory, Salimoff & Co. v. Standard Oil Co., 262 N.Y. 220, 226–227, 186 N.E. 679, 89 A.L.R. 345 (1933); Vladikavkazsky Ry. Co. v. New York Trust Co., 263 N.Y. 369, 189 N.E. 456, 91 A.L.R. 1426 (1934); Bank of China v. Wells Fargo Bank & Union Trust Co., 104 F.Supp. 59 (N.D.Calif.1952); Restatement 2nd, Foreign Relations Law, § 113. They argue that since Jena, where the Foundation was originally organized, is located in East Germany and since West Germany does not claim to have sovereignty or territorial jurisdiction over the Soviet Zone, Mann, "Germany's Present Legal Status Revisited," 16 Int'l & Comp.L.Q. 760, 779, 789 (1967), and the United States does not recognize West Germany as the *de jure* government of all Germany, Zschernig v. Miller, 389 U.S. 429, 88 S. Ct. 664, 19 L.Ed.2d 683 (1968); "Contemporary Practice of the United States Relating to International Law," 57 Am. J.Int'l L. 403, 410 (1963), German law as promulgated in East Germany and interpreted by its courts should be applied.

■ While our Government's diplomatic recognition policy is entitled to considerable weight in determining what law is to be applied, The Maret, 145 F.2d 431 (3d Cir. 1944); Latvian State Cargo & Pass. S. S. Line v. United States, 116 F.Supp. 717, 126 Ct.Cl. 802 (1953); see Bank of China v. Wells Fargo Bank & Union Trust Co., 104 F.Supp. 59, 64 (N.D.Calif.1952), the invocation of the policy is complicated in the present case by the fact that the Court is dealing with a divided country, West Germany being recognized as sovereign only over its own territory and not over that of East Germany, which remains unrecognized by the United States. Choice of law rules normally assume the existence of a territory having an appropriate relationship to the issue, over which the recognized foreign government claims sovereignty. See, e. g., Amstelbank, N. V. v. Guaranty Trust Co., 177 Misc. 548, 31 N.Y.S.2d 194 (Sup.Ct.N.Y. Co.1941).

■ Whether or not German law as declared or construed by the courts of unrecognized East Germany or recognized West Germany should be applied depends to some extent on the nature of the question to be resolved. Normally the acts of an unrecognized regime which pertain to its purely local, private, and domestic affairs will be given effect, see Matter of Luberg's Estate, 19 A.D.2d 370, 372, 293 N.Y.S.2d 747 (1st Dept. 1963); Restatement, 2nd, Foreign Relations Law, § 113; and such acts on the part of East Germany are even applied in West Germany, regardless of diplomatic non-recognition, to the extent that they are not inconsistent with West German policy. Here, however, we are not confronted with acts on the part of East Germany dealing solely with private, local, domestic matters, such as certificates of birth or death, powers of attorney, land transfers, or the like. We are dealing with decisions of East German courts with respect to matters extending beyond the borders of East Germany, such as the nature of a foundation under federal law and the effect to

be given to acts of Wuerttemberg. The questions of whether a private foundation is a federal or state entity, and, if a federal entity, whether its domicile may be altered or transferred by a member state (Wuerttemberg) other than that where its domicile existed for many years (Thuringia), present issues of public policy relating directly to persons and property located in countries other than East Germany. However, to resolve these questions solely according to German law as promulgated and declared by authorities and courts of West Germany ignores the fact that even though the Foundation had no significant contacts with the authorities of Thuringia or successor political divisions in East Germany after it was destroyed in the East through Soviet expropriation, it did come into existence through action of the authorities of the Duchy of Saxe-Weimar, later merged into the State of Thuringia, which in turn became, successively, part of the territory controlled by the Soviet Military Administration and the unrecognized German Democratic Republic (East Germany). In view of the Foundation's territorial contacts with the East before its capacity to function there was destroyed, this Court should not be precluded from considering decisions handed down by the courts of East Germany with respect to the Foundation's legal identity, powers, and status, and giving them such weight as they appear to merit. Fortunately we are aided here by the continuation in effect of the provisions of the German Civil Code throughout both Germanies and by the more fluid and amorphous concept of nationality or domicile of corporations and foundations in Germany, compared with the concept in this country. Testimony of German law experts revealed that while German entities, including private corporations and foundations, depend for their existence upon the approval of their charter or "Statute" by a state, the "nationality" of the entity (which is but another way of referring to the state whose laws govern its existence and legal relationships as an entity) is influenced more by the place where it maintains its principal place of business and its administrative center than by its place of formation. See Note, "Corporations in Exile," 43 Colum.L.Rev. 364, 366 (1943). The "nationality" of a German foundation depends, therefore, at least as much on the body of law by which it is in fact governed as it does on the law of the place where it came into being. Since a foundation's principal establishment is usually located in the state where it is created, its domicile or nationality rarely comes into issue. Here, however, the Zeiss Foundation's principal establishment, its management and its business assets were all involuntarily located in one German state (Wuerttemberg) as the result of the termination of its capacity to exist in the other (Thuringia). The answer to the question of whether, in view of such an unusual change in circumstances, it is to be considered a national of Germany or of Thuringia requires a brief review of the development of relevant law in Germany.

Prior to 1871 the territory which was to become the German Empire, or federal union, was divided between numerous kingdoms, duchies, principalities and free towns, most powerful of which were Prussia, Bavaria, Saxony, Baden and Wuerttemberg. Following popular movements toward nationalism in 1848 and power struggles between rival states, Prussia took the leadership and principally through the deft negotiations of Otto von Bismarck, the various states signed treaties leading to the formation of the empire as a permanent federal state, which in 1871 adopted a constitution substantially in a form passed by Prussia's diet in 1867. One of the constituent states of the empire was the Grand Duchy of Saxe-Weimar-Eisenach, a limited hereditary monarchy governing several scattered districts (e. g., Neustadt, Weimar, Eisenach) and a score of scattered enclaves, many not even contiguous with any other lands of the Duchy. The Duchy itself had resulted from the union of smaller principalities.

Although the member states retained this autonomy as to matters not delegated to the imperial authorities, the latter ruled supreme over all states in the delegated area. The new Constitution established "a common citizenship for all Germany" and provided that "the whole domain of civil * * * and commercial laws" was to be "under the supervision and control of the Empire", Wright, The Constitutions of the States at War, 1914–18, p. 217 (1919). Effective January 1, 1900 the German Empire adopted a federal Civil Code, applicable throughout the German federation, containing provisions relating to foundations which were expressly made applicable to existing foundations created under the laws of member states before the Civil Code was adopted. Thereafter, on January 14, 1905 the Zeiss Foundation Statute was amended by Dr. Abbe, the amendment being approved by the authorities of the Grand Duchy of Saxe-Weimar-Eisenach pursuant to the new German Civil Code.

To the extent that they occupied particular areas, the provisions of the German Civil Code represented the supreme law of the German Empire. The effect of the adoption of Code provisions governing foundations, therefore, was to constitute foundations, including those established under laws of the various German states, or laender, creatures of German federal law, or federal entities, as distinguished from entities of the states where each particular foundation was originally established. Article 55, Introductory Law. Exceptions were made in the case of specific types of foundations, such as the "Gotha" mining companies, which were expressly designated as local state entities because of their strictly local characteristics. See Wang, The German Civil Code, pp. 550–68; Arts. 164–166, The Introductory Law. Subject to such exceptions, however, Germany, having established a common citizenship for all subjects of its different member states, took a further step forward in this federalization process by constituting foundations federal, rather than state, entities. One goal was to assure that even though member states might continue to administer foundations, federal standards and federal authority would assure foundations of minimum guaranties and, if necessary, federal intervention for the purpose of enabling a foundation to continue in existence rather than be relegated to a state of limbo or dependency on the sketchy and inadequate laws of many of the member states. The need for such federally-created provisions for intervention was greater in the case of private foundations than private corporations for the reason that while the private foundation is a legal entity, capable of owning property and carrying on business under a trade name, or "firma," it is not owned by anyone, nor is it an instrument of any governmental agency; and the necessity for establishment of foundations as federal, rather than state, entities was indicated by the changing character of the German states, giving rise to serious questions as to the existence, identity and adequacy of applicable state laws. For instance, in the present case, at the turn of the century the Grand Duchy represented but one of several mergers of different German duchies, kingdoms and principalities, each with its divergent laws, and within 20 years, it in turn would be merged into another state, Thuringia. As a federal law applicable in all such states, the German Civil Code provided some measure of stability and uniformity for private foundations.

Although the Zeiss Foundation became a German federal entity upon adoption of the German Civil Code in 1900, under the German Constitution (unlike that of the United States) administration of the federal law was delegated to the individual member states, each of which was authorized to execute the federal law with full force and effect throughout Germany, subject to resolution by German federal courts of any differences, or conflicts between the states in their administration of the federal law. In implementation of the federal Civil Code's provisions govern-

ing foundations, each member state, including Thuringia, adopted laws governing foundations domiciled in such state. Since a private foundation is in the nature of a trust, the state's participation was essentially ministerial and supervisory in nature, designed to insure that the will of the founder, as expressed in the Statute or charter, would be respected as far as possible. For instance, a foundation came into existence as a juristic person upon the state's acceptance of the Statute, a purely ministerial act.

The domicile of such a foundation would usually be in the state where its Statute was accepted or approved, for the reason that its principal place of business would normally be located there. With the adoption of the German Civil Code, of course, the concept of domicile as attaching to a particular state had less significance than theretofore, since the foundation, being a German federal entity, could do business in any other member state merely by registering its "firma" or its establishments in the other state, a ministerial matter. In other words, although it had a domicile in a particular state, it remained a creature of federal law. Essentially, therefore, the principal significance of the concept of domicile for foundations under German federal law was that it determined the state authority normally expected to supervise the foundation in accordance with federal law, at least to the extent that such supervision was required, without, however, excluding supervision also by another member state, where the foundation was actually engaged in doing business.

Although no authoritative German precedents or teachings prescribe the procedure to be followed to transfer a foundation's domicile from one German state to another, German law experts agree that the normal procedure would be for the foundation's management to obtain approval of the state where it is presently domiciled, and that a prohibition against transfer of domicile (such as that found in Section 121 of the Zeiss Foundation's Statute) would ordinarily bar such a transfer. In the present case, however, the Soviet Military Administration, which controlled the domiciliary state, by expropriating the Zeiss Foundation's assets and preventing it from continuing to function in Thuringia, destroyed its capacity to function there and made it impossible for it to carry out its founder's purposes in that state. Since it owned and operated substantial commercial enterprises elsewhere, however, dissolution was not called for under its Statute (Section 116). In the opinion of highly respected experts in German law, these unusual circumstances would call for exercise by another member state of the power granted by § 87 of the German Civil Code, which provides that where a foundation's purposes can no longer be fulfilled, its statutory purpose may be amended by "the appropriate authority" to enable it to function in accordance with the founder's intention as far as possible. Although this broad authority, in the nature of a codification of a *cy pres* doctrine for foundations, would ordinarily be administered by the state where the foundation is domiciled, and would involve an amendment of some provision of the Statute other than that relating to domicile, nothing in § 87 precludes amendment of a Statute's provision as to domicile where its stated purpose of maintaining its domicile in a particular state can no longer be fulfilled, and nothing in it requires that such an amendment be made by one member state of the German federation rather than another. This Court, therefore, accepts the view of German law experts that under the circumstances presented here (Soviet expropriation which made it impossible to fulfill Dr. Abbe's stated purpose of maintaining the Zeiss Foundation's commercial enterprises and domicile in Jena, and left its operational center and principal remaining commercial works in Wuerttemberg), the State of Wuerttemberg, as a member of the German federation, was empowered by § 87 as "the appropriate

authority" to establish the Foundation's domicile where its administrative center and principal operations were now located.

Having in mind Dr. Abbe's intent to establish an organization that had as its primary purpose the profitable operation of its commercial enterprises in a free enterprise system as the source of funds to cultivate and maintain its operations in the precision technical industry, and that confiscation of its commercial facilities and assets in the East made it impossible to fulfill this primary purpose of the Statute, the establishment of the Foundation's domicile in Heidenheim, where its Boards of Management were located, constituted the only available course that would enable the Foundation to continue "as far as possible" in accordance with "the intention of the founder". (§ 87, German Civil Code) The authorities of Soviet-occupied Thuringia which, by expropriation, made "fulfillment of the purpose of the Foundation * * * impossible," were hardly "the appropriate authority" to amend the Foundation's Statute. It defies common sense to say that a foundation's domicile must continue in a state which seizes its basic assets and denies it the right to carry out its purposes. As an arm of the German federation, the State of Wuerttemberg was, under these extraordinary circumstances, "the appropriate authority," and since § 87 provides that "The authority can amend the Statute of the Foundation as far as the modification of purpose requires," such broad delegation of power included the power to amend the Statute's provision as to domicile (notwithstanding the Statute's provision that it could not be amended), so that the basic purpose of the founder might be continued in another part of Germany rather than be destroyed altogether. Dr. Abbe, as founder, in providing in the Statute that the Foundation's domicile should be Jena, and that this provision as to domicile could not be amended, assumed that the Foundation would be permitted to carry on its commercial enterprises (which

were the source of all of its other activities) in Jena, which was the birthplace of the Zeiss and Schott works. He did not anticipate that governmental action might not only confiscate but prevent the continuation of these enterprises and operations by the Foundation in Jena, leaving others capable of continuing the Foundation's work in another part of Germany. The entire Statute, however, makes it clear that if he had contemplated such a possibility, he would have preferred that the Foundation continue elsewhere in Germany, provided its basic purposes might be achieved there, rather than dissolved. This is evidenced by the Statute's provision (Section 116) that the Foundation was to be dissolved *only* if it became impossible to continue any of its business undertakings with the result that it could "see no longer any grounds for continuing its activity in the sphere of the higher technical industry profitably and be also in possession of no other organizations of a permanent nature and of sufficient importance * * *."

After loss of its assets and ability to function in Jena, the Zeiss Foundation still owned substantial "business undertakings" and "organizations of a permanent nature" in the West, which constituted "grounds for continuing its activity in the sphere of the higher technical industry profitably" there. If the founder's intention was to be respected, the proper course of action was to continue its activities in the West. This it was enabled to do by changing its domicile from Jena to Heidenheim. Section 87 of the German Civil Code permitted intervention by the state authority of Wuerttemberg for the purpose of achieving such a change, so that the validity of the state's action in exercising the supervisory power over foundations delegated to it by § 87 does not depend on the Board's authority.

Defendants' contention that a foundation is strictly a creature of the state which approved the founder's statute or charter, and the supporting testimony of German law experts offered by the de-

fendants, Messrs. Nathan and Honig, must be rejected. Their view to the effect that a member state creating a foundation has always had the powers set forth in Articles 80–88 of the German Civil Code, including the power to dissolve such a foundation or change its purpose, would render these Civil Code provisions superfluous, whereas the interpretation furnished by plaintiffs' German law experts and authorities not only accords with the Code's pattern but gives them meaning and effect, especially in view of the generally accepted doctrine of federalism to the effect that following adoption of the German Civil Code each of the member states, or laender, had only limited autonomy which could be changed from time to time by the central government as the sovereign power. Emerson, State and Sovereignty in Modern Germany, pp. 238–241 (Yale Univ. Press 1928). The view accepted by the Court, which would give effect to the German Civil Code, is that its provisions superseded the private law systems of the states to the extent that the field was occupied by the federal government. In accepting this view the Court has carefully considered not only the authorities and arguments offered by the parties but the credibility to be extended to the experts who testified on the issue. The Court found the testimony of Professor Steindorff, offered by plaintiffs, to be particularly impressive and reliable as a thorough, fair, and carefully reasoned analysis. In contrast, that of Professor Nathan appeared for the most part to be unacceptable, not only because of its weaker support in logic but because of a strong pre-existing bias evidenced in intemperate articles written by him with respect to Zeiss in which he stated that the United States was "in league with German Fascists" in April and May, 1945, when its forces entered Jena, that the history is one of a "pseudo-Zeiss scandal" in which "for monopoly capitalism no

means are notorious enough illegally to enrich itself", that "all the dark powers of the German and American imperialism will appear behind the scene and pull their strings, in order to achieve judicial approval as a cope-stone of their dirty machinations", etc. Mr. Honig, a British barrister offered as another witness by defendants, suffered from the disability of never having practiced law in Germany, taught German law, or written any works or articles on the subject of German law. His testimony was unconvincing on the principal issue. After testifying that § 87 of the German Civil Code authorized a change of domicile of a foundation at least within a land or state, he withdrew this view on the following day. Furthermore, the authorities offered by Nathan and Honig are unpersuasive and clearly distinguishable. An 1843 decision by the Court of Appeal of Celle to the effect that only the state where a foundation legally has its domicile may exercise supervisory power over it, is irrelevent for the reason that it antedated the 1871 unification of Germany and the 1900 adoption of the German Civil Code, with its provisions federalizing foundations, which govern here. As both Professor Nathan and Mr. Honig conceded, the "nationality" of a foundation is essentially a term used to describe the body of law by which it is governed. Since 1900, as Professor Steindorff demonstrated, that body has been the German Civil Code.

The weakness of the position advocated by defendants with respect to § 87 lies partly in their failure to distinguish between a "private" foundation, such as the Zeiss Foundation [2] which is governed by §§ 80–88 of the German Civil Code, and a public one, such as a state insurance or charitable institution, which is essentially a state enterprise. In the case of the former, the founder's intention as expressed in the proposed statute governs, the state's function in accepting the statute being essentially

---

2. In 1943 the German supreme court for labor relations so decided in applying private law to internal relations of the Zeiss Foundation in a case involving an employee's claim against it. (Tr. pp. 1305–1306).

ministerial in character, as is its function in authorizing the establishment of German private corporations, such as AGs and GmbHs. Transfer of the domicile of such private corporations from one state to another has always been treated as a ministerial matter, the transferee state routinely accepting the registration of the business enterprise at its new seat, provided its "Firma," or trade name, will not cause confusion. As a result the courts of West Germany, where a private corporation's assets in the Soviet Zone have been expropriated, have decided that no action on the part of the old domiciliary state is needed to change the domicile to a state where the AG or GmbH now has its principal office, assets and operations. Under § 87 similar principles govern the changing of the domicile of an expropriated private foundation.

The opinions of the courts of East Germany prove to be of little assistance in resolving the issues before us, including the question of whether the Zeiss Foundation's domicile could be validly transferred pursuant to § 87 of the German Civil Code by the State of Wuerttemberg-Baden from Jena to Heidenheim. In the first place, no member of the Boards or other authorized official of the Foundation ever received any advance notice of the advisory opinion rendered on April 6, 1954 by the Supreme Court of East Germany, and no Board member or authorized representative was heard with respect to it or participated in the proceeding instituted by the Council of the District of Jena and the Zeiss VEB before the District Court of Leipsig which resulted in the entry of a default judgment in September, 1959, affirmed with modifications by the Supreme Court of East Germany in March 1961. There were, therefore, in the nature of *ex parte*, default-type proceedings, unlike those which took place in West Germany, where the VEBs or their representatives actively participated as adversaries. As would be readily surmised, the result of such a one-sided type of proceeding was that the East German courts did not have before them much of the essential proof relied upon by this Court with respect to such crucial issues as whether the Boards of Management resigned and whether the effect of expropriation was to prevent the Foundation from functioning in the East as required by the Statute. With respect to these key matters, for instance, plaintiffs have adduced here the testimony of Messrs. David, Kueppenbender, Nelson, Schott, Richter, Seidel and Schacht, none of whom gave testimony, as far as can be determined, in the East German default-type proceeding. Based on such an inadequate, one-sided record, the East German court's findings are different on these essential issues from the findings made here. Deciding on such a different record that the Boards did resign and that the expropriation did not destroy the functioning of the Foundation in the East, the conclusion that the Foundation in Jena, coupled with the VEBs, is legally identical with the Abbe Foundation comes as no surprise, but must be rejected when all the facts are taken into account.

Quite aside from the fact that the decisions of the courts of East Germany were based on different factual premises, however, it must be recognized in weighing these decisions that East German courts do not speak as an independent judiciary of the type found in the United States or even in West Germany, but orient their judgment according to the wishes of the leaders of the socialist state, which are expressed through two coordinated administrative organs, the Ministry of Justice and the Office of the Attorney General. See "The Administration of Justice and the Concept of Legality in East Germany," 68 Yale L.J. 705, 707 (1959). In short, even the East German Supreme Court is made responsible to the highest authorities of the state as a means of insuring "that the content of socialist law and its implementation through the courts are in harmony with the overall state administrative activity during the period of the comprehensive construction of social-

ism".[3] Law and Legislation in the German Democratic Republic (Comments on 1963 Decree as to Fundamental Tasks and Methods of Work of the Judiciary Organs (East Germany)). Nevertheless, to the extent that they may shed light on the legal issues before this Court, they have been considered.

Such consideration reveals the decisions of the Supreme Court of East Germany to be so completely lacking in any objectivity of approach and so thoroughly saturated with a combination of communist propaganda, diatribes against the "capitalist oriented" decisions of the West German courts, and absence of judicial restraint, that any logical analysis is obfuscated by their obvious political mission. For example, after haranguing on the importance and necessity of smashing the Foundation because its assets were used to further "the Fascist predatory war" and amounted to a "war crime", and after conceding that its Jena works had been expropriated, the Court disregards noncompliance thereafter with the essential basis of the Abbe Statute (the Foundation's ownership and operation of its commercial enterprises), simply stating that it "suffered no losses of property apart from having ceased on 17 April 1948 or 1 June 1948 to be the manager of the Jena Stiftung works of old. This, of course, is the equivalent of politely saying it ceased to function at all in Jena. West German court decisions are described in the following terms: inspired and controlled by "monopolistic-capitalistic circles"; "nothing to do with juridical reasoning but amounts to an irresponsible juggling with fictitious notions"; "formalistic bourgeois methods [which] make it impossible to veil such coarse violations of law"; "pretense of strict lawfulness"; "conscious falsification"; and "contradictions between peacefully minded population and a warlike revenge-inspired State, which find their expression chief-ly in the clerico-militaristic federation at Bonn". A faint idea of this lack of a reasoned, objective approach may be gathered from the following excerpt from the Supreme Court's opinion of March 23, 1961:

"The fact that the principle of Socialist society and power politic has of necessity opened up the way of continuously progressing development, of Socialist uplift and Democracy, thus inherently following the tenets of Democratic centralism by broadening more and more, and by no means narrowing, the sphere of duties and responsibilities of the local organs of the power politic, shows clearly enough that exactly these local organs are in most intimate contact with the workers in the cities and the countryside and are thus marked out for incorporating ever more strata of the population into political and economic leadership. That, of course, is an idea a court sworn to the Capitalist system cannot in all probability be expected to grasp. What remains to hold is that the authorities exactly of a State grounded on the fundaments of real Socialist Democracy are far better prepared to successfully carry forward the progressive ideas of the Statute of the Stiftung than is the original monarchical Special Board of the Stiftung, which follows semi-feudal ideas. The Federal Court nevertheless ought to have or could have alighted in any case on the cognition—convincingly proven in the opinion of the bourgeois lawyer Dr. Ernst Wolff of 23rd June 1957—that to explain the Statute of the Stiftung not on the basis of the Statute itself but on that of ideas imputed to the Founder—ideas concerning an economic development he did not and in fact could not anticipate—has nothing to do with juridical reasoning but amounts to an

---

3. Toward this purpose East German judges after being selected by the Ministry of Justice are "instructed" by it and are removable for inefficiency or unreliability arising out of policy differences. The "judge remains a simple party servant", 68 Yale L.J. 707–12, 749 (1959).

irresponsible juggling with fictitious notions.

\* \* \* \* \* \*

"With a view to camouflaging such practice, certain West German theorists and experts of Capitalism and, in their wake, the West German courts have—of course by referring to their unfailing constitution—invented a so-called 'Interzonal Right' which, though not existing in any German law code, is displayed whenever capitalistic and in particular monopolistic interests feel the urge of disturbing the economic development of the German Democratic Republic by appropriation under pretence of strict lawfulness of all somehow attainable assets belonging citizens of that Republic." (Carl Zeiss Stiftung, Jena, et al. v. Firma Carl Zeiss, Oberkochen, Supreme Court of the German Democratic Republic, March 23, 1961 (D's Ex. 228 pp. 1447–48, 1454))

In contrast to those of East Germany, the decisions of the courts of West Germany appear to be restrained, objective, reasonably logical, and dispassionate in their approach. They were rendered only after all parties, including authorized representatives from East Germany (the Council of Gera purporting to act as Special Board of the Foundation in one action and for the VEB Carl Zeiss Jena in another) appeared and were given full opportunity, which they exercised, to offer proof and be heard. Nevertheless, even assuming the availability of collateral estoppel in this action with respect to issues thus thoroughly litigated between the same parties in West Germany, we do not believe that the decisions of the courts of West Germany are entitled to as much effect as is argued for them by plaintiffs here.

■ The decision of the Federal Supreme Court of West Germany rendered on July 24, 1957 granting injunctive relief in favor of the Carl Zeiss firm of Heidenheim against the VEB Carl Zeiss Jena and the DIA was based on the conclusion that expropriation of the Foundation's assets had shifted the "economic center of gravity of the enterprise" to the West, with the result that the firm's principal place of business became Heidenheim, and the Zeiss Board in Heidenheim (Prof. Bauersfeld, Dr. Kueppenbender and Mr. Henrichs) was still the official Board, with authority under Section 114 of the Statute to act on behalf of the Foundation with respect to the Zeiss trademark and tradename in West Germany, regardless whether its legal domicile had been validly transferred from Jena to Heidenheim. Since we have already independently found on the basis of the evidence before us that the Board did not resign and that the effect of expropriation was to leave Heidenheim as the Foundation's administrative center or principal place of business (whether or not it be characterized as a shifting of an "economic center of gravity"), it is unnecessary to accord collateral estoppel effect to the findings of the courts of West Germany as to these issues, although we would not be prevented from doing so merely because the West German courts would not give such effect to them. However, even holding (as we do) that after such thorough consideration and determination of the issues before the courts of West Germany the necessity for putting an end to litigation requires that the parties be estopped from relitigating them here, Leo Fiest Inc. v. Debmar Publishing Co., 232 F.Supp. 623 (E.D.Pa. 1964) (per Kirkpatrick, J.); Bata v. Bata, 39 Del.Ch. 258, 163 A.2d 493 (1960), cert. denied, 366 U.S. 964, 81 S.Ct. 1926, 6 L.Ed.2d 1255 (1961); Restatement of Judgments §§ 68, 70, those decisions did not decide that the Zeiss Foundation's domicile had been validly transferred to Wuerttemberg pursuant to § 87 of the German Civil Code, which is one of the alternative bases upon which this Court rests its decision. It was unnecessary for the West German courts to decide that issue for the reason that the official members of the Board (Messrs. Kueppenbender, Bauersfeld and Henrichs) were still alive and had au

thority to act with respect to the business of the Zeiss firm in West Germany, regardless whether the Foundation's domicile had been validly established in the West. Since the time when the decisions of the West German courts were handed down, however, all members of the Board as it then existed except one Kueppenbender) have died, and have been replaced by members appointed by the appropriate Wuerttemberg authorities acting on the basis that since the Foundation's domicile had been established at Heidenheim they had authority to act under the applicable provisions of the Abbe Statute. Since Kueppenbender lacks authority alone under the Abbe Statute (Section 9) to prosecute the present suit, and in any event has purported to act with his newly appointed "colleagues" rather than those who had been originally appointed in Jena and then forcibly transferred to the West (Bauersfeld, Henrichs and Joos), the decisions of the West German courts estop defendants from questioning the fact (independently found by this Court on the other evidence before it) that the Foundation enterprise known as the firm Carl Zeiss was a continuation of that which had existed in Jena.[4] The West German decisions do not, however, have the effect of precluding defendants from raising legal issues not considered by the West German courts, such as the existence of the Foundation as a federal entity and the authority of Wuerttemberg to act under § 87 of the German Civil Code.

Plaintiffs further contend that they are entitled to judgment on the ground that the Wuerttemberg Decrees of 1949 and 1954 (the first creating an additional domicile for the Foundation in Heidenheim and the second transferring its domicile from Jena to Heidenheim) and the law passed by the West German Parliament on August 3, 1967 confirming the validity of those decrees, constituted acts of a state recognized by the United States, the validity of which may not be questioned by this Court under the "act of state" doctrine reaffirmed by the Supreme Court in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S. Ct. 923, 11 L.Ed.2d 804 (1964); see Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897); Banco de Espana v. Federal Reserve Bank, 114 F.2d 438 (2d Cir. 1940); Bernstein v. Van Heyghen Freres Societe Anonyme, 163 F.2d 246 (2d Cir.), cert. denied, 332 U.S. 772, 68 S.Ct. 88, 92 L. Ed. 357 (1947). The doctrine is founded on the principle that our courts should refrain from action that might hinder or embarrass our Government's Executive Branch in its conduct of our country's foreign relations. It dictates that our courts not sit in judgment as to the acts of a foreign state with respect to matters within its jurisdiction, i. e., "a thing located, or a status or other interest localized, in its territory". See Restatement of Foreign Relations Law § 17. A foreign state for such purposes is an entity recognized by our Government, which has a defined territory and population under control of its government.

4. In addition to being furnished with the decisions of the courts of West Germany and East Germany, this Court has received copies of the decisions of the High Court of West Pakistan (Sept. 29, 1967), High Court of Justice, Chancery Division (England), House of Lords, 2 AER 536 (1966), Court of Appeal of Paris (April 2, 1963), Cour de Cassation (Supreme Court) of France (March 15, 1966), and the Swiss Federal Supreme Court. However, the 1957 decision of the West German Supreme Court, being the first final judgment on the merits between the parties with respect to certain

basic issues, would be entitled to *res judicata* effect with respect to such issues (in accordance with the policy of putting an end to litigation) unless the court of another country, which would normally recognize the *res judicata* effect of prior foreign judgments, refused to give such effect to it. Smit, International Res Judicata and Collateral Estoppel in the United States, 9 U.C.L.A.L.Rev. 44 (1961). None of the other aforementioned countries have so ruled. On the contrary, several of the decisions do not represent final judgments on the merits between the parties.

Restatement of Foreign Relations Law § 4.

■■■ Whether or not Wuerttemberg, at the times here involved, is considered a member state, or land, of some other entity (Germany, West Germany, or the American Zone of Occupation), it has possessed sufficient attributes of an independent sovereign to qualify as a "state" within the meaning of the "act of state" doctrine. Shapleigh v. Mier, 83 F.2d 673 (5th Cir. 1936), affd. on other grounds, 299 U.S. 468, 57 S.Ct. 261, 81 L.Ed. 355 (1937); Stark v. Howe Sound Co., Inc., 254 App.Div. 919, 5 N.Y.S.2d 551 (3d Dept.1938), rehearing denied, 255 App.Div. 737, 7 N.Y.S.2d 99, affd. per curiam, 280 N.Y. 622, 20 N.E.2d 1007, rehearing denied, 280 N.Y. 837, 21 N.E.2d 885 (1939). It has had the power to engage in foreign relations with the consent of the Government of West Germany and has done so. See Article 32, West German Constitution, Peaslee, Constitutions of Nations, Vol. 2, pp. 30, et seq. (2d ed.1956); Leisner, "The Foreign Relations of the Member States of the Federal Republic of Germany," 16 U.Toronto L.J. 346, 356 n. 36 (1966). Thus Wuerttemberg is entitled to sovereign immunity. Sullivan v. State of Sao Paulo, 36 F.Supp. 503 (E.D.N.Y.), affd., 122 F.2d 355 (2d Cir. 1941). As for West Germany, whose Parliament passed the 1967 Law, there can be no serious question about its status as a foreign "state" within the doctrine.

It is likewise clear that the Wuerttemberg acts in question were concerned with a matter of "public interest" since they related to and affected rights of thousands of employees and property worth many millions in the West. As the decrees themselves noted "It is in the public interest that the enterprises of the Carl-Zeiss Foundation may be able to enforce their rights, also abroad, and to fulfill their tasks," in view of the importance of the Foundation to the German economy's development of precision-mechanics and optics.

■■■ Defendants' contentions that the Wuerttemberg acts cannot qualify as "acts of state" because they were passed without notice to persons in Jena and an opportunity to be heard and hence are offensive to the public policy of the United States, and that the 1967 Law is unconstitutional, must also be rejected. The fundamental policy underlying the "act of state" doctrine precludes our attacking or undermining the act of a foreign sovereign on such grounds. Banco de Espana v. Federal Reserve Bank, 114 F.2d 438, 444 (2d Cir. 1940); Pasos v. Pan American Airways, 229 F.2d 271 (2d·Cir. 1956).

Defendants further object to treatment of the Wuerttemberg decrees as "acts of state" on the ground that aside from § 87 of the German Civil Code, Wuerttemberg lacked jurisdiction to enact a law affecting matters beyond its own territory, i. e., the status and domicile of a Foundation located in Jena. Since we have already decided that the Foundation was a federal German entity and that Wuerttemberg had jurisdiction as a member of that federation, pursuant to § 87, to act with respect to its domicile under the circumstances presented here, it is unnecessary to resolve that issue. However, since the parties have spent much time and effort on it, we state our views briefly.

■■■ One of the fundamental conditions of the "act of state" doctrine is that the foreign state whose act is involved have a clearly recognizable jurisdictional basis for its action, usually one based on territorial control over the subject of its action. Repeatedly our Supreme Court in reaffirming the doctrine has expressly referred to it as relating to the acts of a foreign sovereign "within its own territory". Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 400, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); see Restatement (2nd) on Foreign Relations Law § 43 (1965); Republic of Iraq v. First National City Bank, 353 F.2d 47 (2d Cir. 1965); F. Palicio y Compania, S. A. v. Brush, 256 F.Supp. 481, 486 (S.D. N.Y.1966), affd., 375 F.2d 1011 (2d Cir.

1967). The "act of state" doctrine may therefore be invoked here as an independent basis for recognition of the Wuerttemberg acts and the 1967 Law only to the extent that West Germany had territorial jurisdiction to act. However, the mere fact that the foreign state's act, in addition to regulating matters within its territorial jurisdiction, may have some indirect impact outside its territory, does not preclude our treatment of it as an "act of state."

Although our Government has extended diplomatic recognition to West Germany and refused recognition to East Germany, which it considers to be under the effective control of the Soviet Union, West Germany is not recognized by us as having any territorial jurisdiction, either *de facto* or *de jure*, over East Germany. It is true that on September 19, 1950, following the organization of the West and East German governments, the United States, Great Britain and France issued a communique stating that "pending the unification of Germany" they considered West Germany "the only German government freely and legitimately constituted and therefore entitled to speak for Germany as the representative of the German people in international affairs" (23 Dept. of State Bulletin 530 (1950)). In later publications, however, our Government made it clear that the communique was not intended to constitute recognition of West Germany as the *de jure* government of East Germany. See interpretative minute issued by the three powers with respect to the September 19, 1950 communique, Bathurst and Simpson, Germany and the North Atlantic Community, A Legal Survey (1956), p. 188; Mann, "Germany's Present Legal Status Revisited," 16 Int'l & Comp.L.Q. 760, 789 (1967), instructions by our Department of State to its consuls with respect to East German nationals, "Contemporary Practice of the United States relating to International Law," 57 Am.J. Int'l Law 410 (1963), and the Supreme Court's recent decision in Zschernig v. Miller, 243 Or. 567, 412 P.2d 781, 415 P.2d 15, revd., 389 U.S. 429, at p. 449, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968).

The Wuerttemberg Acts of 1949 and 1954 and the 1967 Law acted substantially with respect to subjects within West Germany's territorial jurisdiction, i. e., extensive Foundation assets, employees and activities located there. In taking such action they merely gave legal recognition to the *de facto* existence of the Foundation within their borders by granting it a domicile and providing it with legitimation entitling it to be registered for the purpose of continuing to conduct the business controlled by its Boards of Management in West Germany. To that extent the Wuerttemberg Acts and the 1967 Law appear to qualify for recognition as "acts of state". To the extent that the 1954 Decree, and the 1967 Law affirming it, purported to act with respect to a matter not within the territory of West Germany, i. e., the 1954 termination of any domicile for the Foundation in Jena, they cannot be recognized as acts of state. But since the Foundation had already ceased to exist in fact in Jena, and Wuerttemberg was in effect giving legal recognition to the *de facto* continued existence of what remained of it in the West, the Wuerttemberg Act to such extent was both superfluous and immaterial.

In an effort to meet the objection that the acts in question were in part extraterritorial, plaintiffs urged that the objection cannot apply for the reason that Germany continued to exist under international law as a single unitary sovereign state occupied by four hostile powers which had neither annexed nor destroyed it as a sovereign state but were bound under Article 43 of the Hague Regulations to respect the exercise by Wuerttemberg of the powers granted to it under the German Constitution and Civil Code. Although Germany, at least prior to the formation of the Federal Republic on September 21, 1949, has been considered by the United States to be *de jure* a unified state occupied by foreign powers exercising its

sovereign authority pursuant to the Hague Regulations, see State of Netherlands v. Federal Reserve Bank, 201 F.2d 455 (2d Cir.1953); Clark v. Allen, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947); Documents on Germany 1944–1961, Committee on Foreign Relations, U. S. Senate, 87th Cong., 1st Sess. 1961; Mann, "Germany's Present Legal Status Revisited," 16 Int'l & Comp.L.Q. 760 (1967), the U.S.S.R. through its military administration was in fact in complete control of East Germany and vested by agreement between the four occupying powers with the exclusive power in its own zone of occupation to exercise the supreme authority in Germany. Tripartite Agreement of November 14, 1944 on Control Machinery in Germany, Article 1, Documents on Germany, 1944–1961, 87th Cong., 1st Sess. pp. 1–3; Declaration as to the Unconditional Surrender of Germany, June 5, 1945, The Axis in Defeat, State Dept. Publication 2423, pp. 62–70; Statement of the Governments of the United Kingdom, the United States of America, etc., on Control Machinery in Germany, June 5, 1945, Documents on Germany, 1944–1961, 87th Cong., 1st Sess., pp. 19–20; Protocol of Proceedings of Berlin Conference, Foreign Relations of the United States, Conference of Berlin (Potsdam), 1945, vol. 2, II, A, 1. Furthermore, following the formation of the Federal Republic of Germany in September, 1949, the government of West Germany did not purport to exercise sovereign authority with respect to matters in East Germany, either de jure or de facto. Its purported jurisdiction and its constitution were limited to West Germany, its constitution stating that it would be put into force in other parts of Germany only upon their acquiescence. Basic Law of the Federal Republic of Germany, Art. 23, Peaslee, Constitutions of Nations, Vol. II, p. 34 (2d ed.1956). As far as our Government has been concerned, sovereign power in East Germany has been exclusively exercised by the Soviet Union through its agency or instrumentality, the government of East Germany, which remains unrecognized by us as an independent state. See "Contemporary Practice of the United States Relating to International Law," 57 Amer.J. Int'l L. 403, 410 (1963), and Zschernig v. Miller, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968).

Thus, although the Wuerttemberg decrees and the German Parliament's Act of 1967 are not entitled to recognition as acts of state to the extent that they purport to terminate the Foundation's domicile in East Germany since to that extent they acted extraterritorially, they are entitled to such recognition insofar as they acted to give a legal status to the Foundation's de facto existence in West Germany as a continuation in the West of the original Zeiss cooperative enterprise, whose remaining commercial assets (worth 30 million marks) and personnel were almost entirely within the West's territorial jurisdiction. See comments to § 27, Restatement of Foreign Relations Law. Although its United States trademarks are deemed to have their situs here and a line must be drawn somewhere between the direct and indirect territorial consequences of an act of state, the Wuerttemberg Decrees and 1967 Law did not purport to adjudicate ownership of these marks. They simply recognized that the Foundation was now located in West Germany. The act of state doctrine is not rendered inapplicable because the act involved has some impact outside of the territory of the acting state.

■ Regardless of their status as acts of state, the Wuerttemberg Decrees and 1967 Law represent the acts of a friendly foreign power, diplomatically recognized by the United States, which are consistent with, and in furtherance of, our own Government's foreign policy interests, and on December 28, 1960, the Attorney General of the United States, in deciding to sell the stock of Carl Zeiss, Inc. (vested in World War II) to plaintiff rather than to Soviet-controlled VEBs or similar agencies, reaffirmed this policy, stating:

"Upon consultation with the Department of State, it has been determined

that, in the administration of former Zeiss property in the United States vested under the Trading with the Enemy Act, the Carl Zeiss Foundation in the Federal Republic of Germany should be recognized as the legitimate Carl Zeiss Foundation and its operating firms as the producers of genuine 'Zeiss' products and that the firm now operating as 'Optik Carl Zeiss Jena V.E.B.', or related firms, using, in part, nationalized plants of the Foundation in the Soviet Zone of Germany, should not be so recognized. The foregoing determination is consistent with the foreign policy interests of the United States and supports this Government's policy of recognizing the Federal Republic as the only German Government which has been legitimately constituted."

In such circumstances, absent some fundamental policy objections (such as those inherent in penal or revenue laws), the acts in question are entitled to recognition under principles of comity, at least for purposes of determining ownership of property having its situs in the United States (i. e., the United States Zeiss name and marks). Anderson v. N.V. Transandine Handelmaatschappij, 289 N.Y. 9, 43 N.E.2d 502 (1942); State of Netherlands v. Federal Reserve Bank, 201 F.2d 455 (2d Cir. 1953). Faced with a remarkably similar situation in *Anderson*, the New York Court of Appeals stated:

"There can be no doubt that the decree of May 24, 1940, promulgated by the recognized government of the State of the Netherlands is part of the law of a friendly sovereign State of which the defendants are subjects and in which the defendants are domiciled, * * *. By comity of nations, rights based upon the law of a foreign State to intangible property, which has a situs in this State, are recognized and enforced by the courts of this State, unless such enforcement would offend the public policy of this State. That rule is part of the law of this State, as it is, in general, the law of all countries which accept the reign of law." (289 N.Y. at p. 19, 43 N.E.2d at p. 506)

Since we have decided that the Wuerttemberg Decrees are entitled to recognition as acts of state to the extent indicated, it is unnecessary to deal at any length with defendants' contention that the Law passed on August 3, 1967 by West Germany's Parliament, which affirmed Wuerttemberg's jurisdiction to adopt the decrees, should not be accepted as an act of state for the reason that it is invalid under the German Constitution. Undoubtedly for the very policy reasons which led to adoption of the "act of state" doctrine our courts have consistently refused to embark upon the treacherous and temerarious course of passing upon the constitutionality of a foreign government's acts, which could hardly serve to promote our foreign relations. Banco de Espana v. Federal Reserve Bank, 114 F.2d 438, 444 (2d Cir. 1940); Pasos v. Pan American Airways, 229 F.2d 271 (2d Cir. 1956); Shapleigh v. Mier, 83 F.2d 673 (5th Cir. 1936), affd. on other grounds, 299 U.S. 468, 57 S.Ct. 261, 81 L.Ed. 355 (1937); Eastern States Petroleum Co. v. Asiatic Petroleum Corp., 28 F.Supp. 279 (S.D. N.Y.1939); Fuhr v. Newfoundland-St. Lawrence Shipping Ltd., 24 F.R.D. 9, 12 (S.D.N.Y.1959). In any event, defendants' contention that the 1967 Law amounts to a camouflaged "Einzelgesetz," i. e., a legislative act designed to decide a particular controversy, is based entirely on suspicion. While there are circumstances indicating that the law was inspired by the Zeiss case (e. g., Dr. David's furnishing of a legal memorandum to the West German Ministry of Justice and Parliament with respect to the legal status of the Foundation, provisions of its Statute and a draft that would encompass the Zeiss issue), the law on its face does not purport to decide the Zeiss issue or limit itself to any particular controversy. On the contrary, it purports to deal with the scope of jurisdiction of all West German states, or laender, to act with respect to foundations which formerly had their domiciles

outside of West Germany. Furthermore, defendants fail to provide any instance where such a law has been invalidated in Germany or elsewhere.

Defendants' further contention that the 1967 Law must be disregarded as an act of state on the ground that it would violate American constitutional principles must also be rejected. There is no authority for the proposition that the act of state doctrine applies only to foreign acts that would pass muster under our Constitution; on the contrary, foreign laws inimical to our constitutional principles have been recognized, e. g., Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). However, to the extent that principles of comity form a basis for giving effect to the 1967 Law, this Court would not be precluded from rejecting that Law if it violated our own concept of due process and fundamental fairness.

Defendants' argument is bottomed on the principle that a law passed to give retroactive validity to conduct is unjust for the reason that during the long intervening period before the retroactive law was enacted people were entitled, in entering into legal relations, to rely upon the legal order as it existed previously. Here, however, after Wuerttemberg's enactment of the 1949 and 1954 decrees, no sound basis existed for treating them as nullities or assuming that the Foundation's domicile was in East Germany rather than in Heidenheim. On the contrary, the issues of the identity, status, and domicile of the Foundation were being actively litigated in the German courts by the defendants. Since the existence of the Foundation's Boards of Management, assets, employees and operations in West Germany afforded Wuerttemberg an adequate jurisdictional basis for its action in establishing a domicile there, the 1967 Law did not constitute a curative act designed to remedy mistakes or erase illegalities. See, Swayne & Hoyt Ltd. v. United States, 300 U.S. 297 at 302, 57 S.Ct. 478, 81 L. Ed. 659 (1937). It works no injustice upon the defendants.

To the extent that principles of comity provide a basis for adherence to the Wuerttemberg decrees, defendants raise a more serious question in contending that the decrees violate United States due process concepts because they were enacted without any notice to Jena and opportunity to be heard, see Hilton v. Guyot, 159 U.S. 113, 202, 16 S.Ct. 139, 40 L. Ed. 95 (1895). Aside from the absence of any proof that such notice is customary, the record indicates that even if such notice had been given, it would have been disregarded by the defendants, at least as to the 1949 decree, since the proof is convincing that as far as the defendants and the Soviet administration was concerned at that time, the Foundation was dead and, as a practical matter, there was no real hope of enforcing the Soviet expropriation decree in the West. By November, 1951, defendants were apprised of the 1949 decree in connection with proceedings pending in the German Patent Office in Munich. No action was taken to attack it, however, until October 1954, when the Council of the District of Gera instituted an action in the Administrative Court of Stuttgart against the government of Wuerttemberg attacking the validity of both the 1949 and 1954 decrees. The Jena interests were afforded full opportunity to be heard in that proceeding, which culminated in dismissal of the action by the Administrative Court on September 29, 1961, which was affirmed by the Administrative Court of Appeals of Baden-Wuerttemberg, following which an appeal to the Supreme Federal Administrative Court was dismissed. Under all the circumstances, including the opportunity afforded to challenge extensively the legality of the Wuerttemberg decrees, we see no basis for disregarding the procedure by which they were enacted as offensive to our concepts of due process.

Our reasons for concluding that the plaintiff Foundation is identical with the original Zeiss Foundation and entitled to ownership of its United States trademarks apply with equal (if not greater) force in the case of Zeiss Ikon A.G. of

Stuttgart. We conclude that plaintiff Zeiss Ikon A.G. is the same corporation as that which, prior to the Soviet expropriation of its assets in 1947, had its seat in Dresden (Soviet Zone), with manufacturing establishments in Stuttgart and West Berlin, and that it is the owner of the United States "Zeiss Ikon" marks. In June 1947 the Soviet controlled Ministry for Economics and Economic Planning of the Government of the Land of Saxony (where Dresden is located) expropriated all assets of Zeiss Ikon A.G. without compensation, effective July 1, 1946. As in the case of the later Soviet expropriation of the Zeiss Foundation's assets, the effect of the expropriation of Zeiss Ikon was to destroy its capacity to function in the Soviet Zone leaving unaffected its assets located beyond the territorial borders of that Zone, including its manufacturing plants in Stuttgart and West Berlin and its "Zeiss Ikon" marks there and those used in the United States in connection with sale of merchandise manufactured in Germany.

 The identification of plaintiff Zeiss Ikon A.G. as the same entity which owned the United States "Zeiss Ikon" trademarks is clear. The transfer of its domicile to West Germany presented few of the legal or conceptual problems encountered in the case of the Foundation. We have already noted the tendency of continental Civil Code countries to associate nationality or domicile more with the place of principal establishment than the state of origin, see Note, "Corporations in Exile," 43 Colum.L.Rev. 364 (1943), and that transfer of the domicile of an AG or a GmbH is treated in Germany essentially as a ministerial matter. Furthermore, in the case of Zeiss Ikon its by-laws expressly permitted its stockholders to hold meetings in Stuttgart, Berlin, Jena or Dresden. Two-thirds of its outstanding stock was owned by the Foundation, whose management was located in the West. Nothing in German law forbade its stockholders from holding a stockholders' meeting in Stuttgart or West Berlin and voting to transfer its domicile from Dresden to Stuttgart. This is exactly what they did. On March 3, 1948 a special meeting of its stockholders held in Stuttgart passed a resolution transferring its domicile from Dresden to Stuttgart. On August 18, 1948, an entry recording the transfer was made in the Commercial Register of the County Court in Stuttgart. The validity of this procedure under German law was attested to not only by German law experts called by plaintiffs but by one of defendants' own experts who testified that the domicile of a German AG could be validly transferred by such procedure. Furthermore, in a well-reasoned decision handed down on February 15, 1958, in a suit between plaintiff Zeiss Ikon A.G. and the V.E.B. Zeiss Ikon Dresden, the Federal Supreme Court of West Germany upheld the validity of the transfer of domicile. Accordingly, we find that the plaintiff Zeiss Ikon A.G. is identical with the corporation of that name which engaged in the manufacture and sale of photographic equipment and similar merchandise using the trademark "Zeiss Ikon" and other similar trademarks which it owned.

 Since we find plaintiff Foundation to be the "true" Zeiss Foundation and owner of the trade name and trademarks in dispute, it is unnecessary to dwell at length on plaintiffs' contentions that defendants' claim to ownership should be rejected as a violation of both the United States public policy against recognition of East Germany and § 5(b) of the Trading with the Enemy Act. Although our Government's policy of nonrecognition has been taken into consideration in denying extraterritorial effect to confiscatory expropriation or nationalization decrees of an unrecognized foreign state, e. g., The Maret, 145 F.2d 431 (3d Cir. 1944); Latvian State Cargo & Pass. S. S. Line v. United States, 116 F.Supp. 717, 126 Ct.Cl. 802 (1953), this Court has not considered itself bound by our non-recognition policy to disregard German law as construed by courts of East Germany but, on the contrary, has carefully con-

sidered decisions of the East German courts (see pages 906–907 supra). Likewise, in the exercise of its discretion, the Court would not be barred by our Government's non-recognition policy from awarding United States trademarks to citizens or residents of a non-recognized country found to be the owners of them any more than our Government deems itself barred from conducting trade relations with East Germany and other "Iron Curtain" countries. See Zschernig v. Miller, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968); Bank of China v. Wells Fargo Bank & Union Trust Co., 104 F.Supp. 59 (N.D.Calif. 1952), modified, 209 F.2d 467, 48 A.L.R. 2d 172 (9th Cir.1953); Upright v. Mercury Business Machines Co., 13 App.Div. 2d 36, 213 N.Y.S.2d 417, 1st Dept. 1961).

Defendants are, however, barred from asserting any claims to the United States trademarks in dispute by § 5(b) of the Trading with the Enemy Act (50 U.S.C. App. § 1 et seq.) and regulations thereunder (8 C.F.R. § 507.46). Section 5(b) authorizes regulations prohibiting acquisition, use or transfer of rights in property subject to United States jurisdiction in which a foreign country has an interest; and 8 C.F.R. § 507.46 prohibits transfer or exercise of any rights by German nationals with respect to trademarks "in" or "registered in" the United States on December 31, 1946 without authority of the Attorney General or Director of the Office of Alien Property. The Zeiss trademarks in dispute are various United States trademarks which the United States Government has purported to vest in the Alien Property Custodian (later the office of Alien Property).

Relying upon Rogers v. Ercona Camera Corporation, 107 U.S.App.D.C. 295, 277 F.2d 94 (1960), which held that the Attorney General's vesting of the Zeiss trademarks was ineffective, defendants argue that 8 C.F.R. § 507.46 is inapplicable because the marks were not effectively "registered" in the United States. Whether or not they were "registered," however, they have their situs "in" the United States, see F. Palicio y Compania, S.A. v. Brush, 256 F.Supp. 481, 491–492 (S.D.N.Y.1966), affd., 375 F.2d 1011 (2d Cir. 1967), and the Act and regulation in question are not limited to vested marks registered in the Attorney General's name but they are much broader in their application, extending to German nationals' transactions in any trademarks in the United States. *Ercona* was not concerned with what property is within the scope of § 5(b) but with the Attorney General's "vesting" rights and his right to prohibit importation of Jena-made "Zeiss"-marked goods by virtue of such purported vesting. Since the trademarks in issue are "in" the United States, neither defendant VEB, nor Ercona as its assignee, would be entitled to exercise any rights in them in the absence of authorization from the Attorney General or Director of the Office of Alien Property pursuant to 8 C.F.R. § 507.46.

We next turn to a series of arguments asserted by defendants in support of their defenses and counterclaims. The first of these is the contention that even if plaintiffs are entitled as owners to the Zeiss trade name and marks in the United States, defendants are entitled to "concurrent" use of the name and marks because of laches, acquiescence, or abandonment on plaintiffs' part, which is claimed to have caused defendants serious prejudice, and because of the American public's interest in having two competitive sources of Zeiss-marked goods. Defendants rely principally on the fact that although plaintiffs learned of the Soviet Military Administration's expropriation of the trademarks in June, 1948, the present suit claiming infringement of the United States trademarks was not instituted until 1962, 14 years later; that during the period from 1949 to 1954 plaintiffs encouraged defendants to use the Zeiss marks on Jena-manufactured goods shipped out of the Soviet Zone at a time when West Germany was unable to meet the market's demand; that in the meantime defendants increased their investment in the United States market through sales promotion and advertising;

that plaintiffs never sought to intervene in the *Ercona* suit commenced in 1956 (in which defendants sought to restrain the Attorney General's claim of ownership in the Zeiss mark) although many of the same facts and issues were involved in that action; and that during plaintiffs' delay, many key witnesses have died and other proof become unavailable.

Where a person entitled to exclusive use of a trademark is guilty of unreasonable delay in asserting his rights against an infringer or junior user, or acquiesces in the latter's use, or evinces an intent to abandon his rights in the marks, a court of equity has the discretionary power, after weighing the respective interests of the parties, to deny injunctive relief or an accounting. Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60 (1900); La Republique Francaise v. Saratoga Vichy Spring Co., 191 U.S. 427, 24 S.Ct. 145, 48 L.Ed. 247 (1903). The denial of relief, however, is not determined by rules of thumb. The existence of laches or acquiescence, and whether it is sufficient to warrant such denial, depends upon a consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties. Among the factors to be weighed in determining whether laches will bar relief are the strength and value of the trademark right asserted, Ambrosia Chocolate Co. v. Ambrosia Cake Bakery, 165 F.2d 693 (4th Cir. 1947); the plaintiff's diligence, or lack of it, in seeking to enforce the mark, Anheuser-Busch Inc. v. Du Bois Brewing Co., 175 F.2d 370 (3d Cir. 1949), cert. denied, 342 U.S. 943, 72 S. Ct. 555, 96 L.Ed. 701 (1951); the harm that will result to the senior user if relief is denied, Standard Oil Co. of Colorado v. Standard Oil Co., 72 F.2d 524 (10th Cir. 1934); whether the junior user is an innocent infringer who acted in good faith ignorance of the senior's rights, Chandon Champagne Corp. v. San Marino Wine Corp., 335 F.2d 531 (2d Cir. 1964); the extent to which the senior and junior uses of the mark are competitive, Ancient Egyptian Arabic Order of Nobles of the Mystic Shrine v. Michaux, 279 U.S. 737, 49 S.Ct. 485, 73 L.Ed. 931 (1939); Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961), cert. denied, 368 U.S. 820, 82 S. Ct. 36, 7 L.Ed.2d 25 (1961); and the extent of harm or prejudice suffered by the junior user as a result of the senior's delay, Proctor & Gamble Co. v. J. L. Prescott Co., 102 F.2d 773 (3d Cir.), cert. denied, 308 U.S. 557, 60 S.Ct. 80, 84 L. Ed. 468 (1939). Where the owner of the trademark fails to take any action for many years to enforce a relatively weak trademark against a junior user who has proceeded innocently to use the same or similar mark on non-competing goods in which he has invested large sums, so that denial of relief would cause relatively little harm to the senior user in contrast to the serious prejudice that would result to the defendant, relief will be denied.

As distinguished from laches, acquiescence constitutes a ground for denial of relief only upon a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant. Aunt Jemima Mills Co. v. Rigney & Co., 247 F. 407 (2d Cir.), cert. denied, 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540 (1917); Alfred Dunhill of London, Inc. v. Dunhill Tailored Clothes, 119 U.S.P.Q. 325 (S.D. N.Y.1958). Although acquiescence may bar relief even where the plaintiff acts diligently, whether conduct amounts to acquiescence warranting denial of relief turns on an examination of all the surrounding circumstances, and requires a balancing of the equities.

In contending that the plaintiff Foundation granted to defendants in 1950 what amounted to a "naked" license to manufacture in Jena goods bearing the Zeiss mark, thereby abandoning its trademark rights, the defendants assume a heavy burden, for abandonment constitutes a defense only upon a showing of intent to abandon, Saxlehner v. Eisner & Mendelsohn Co., 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60 (1900). Al-

though a "naked" license may be the basis for an inference of abandonment where the licensor maintains no control over the quality of goods made by the licensee, E. I. Du Pont De Nemours & Co. v. Celanese Corp., 167 F.2d 484, 489, 3 A.L.R.2d 1213 (C.C.P.A.1948), the licensor is not limited by the absence of quality control provisions in the license agreement. If in fact the licensor has made a reasonable inspection of the merchandise bearing the trademark (even though not every item has been inspected) and there is no showing that any of the goods were below the essential quality standards, the defense must fail. Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358 (2d Cir. 1959); E. I. Du Pont De Nemours & Co. v. Celanese Corp., supra.

Defendants' invocation of the terms "concurrent use" and "joint use" as defenses is misplaced. Standing alone they do not represent defenses to trademark infringement claims. They simply describe factors considered in determining the equities in a particular case. To put it another way, where the products of the respective parties are not directly competitive, the plaintiff's interest in securing equitable relief may be entitled to less weight than where the infringer markets a competitive product. Chandon Champagne Corp. v. San Marino Wine Corp., 335 F.2d 531 (2d Cir. 1964). But even in the absence of product competition a trademark holder's right to relief has been recognized, such as where expansion into the infringer's market is planned or the infringer's business practices tarnish the plaintiff's reputation. Aunt Jemima Mills Co. v. Rigney & Co., supra; S. C. Johnson & Son v. Johnson, 175 F.2d 176, 178–179 (2d Cir.), cert. denied, 338 U.S. 860, 70 S.Ct. 103, 94 L. Ed. 527 (1949).

■ The contention advanced by defendants to the effect that joint use of trademarks will be sanctioned where it will promote competition and curb monopoly deserves little mention. Unlike a patent, which grants to the holder the right to exclude all others from using a product or process, a trademark gives monopoly power only with respect to a name or mark. What market power it does possess is the result of its exploitation and development of the name. Although the right to exclusive use of a valuable trademark may facilitate restraints of trade, such conduct will not be presumed, particularly since the infringer is not prevented from selling its competing product under another name. Standard Oil Co. v. Humble Oil & Refining Co., 363 F.2d 945 (5th Cir. 1966), cert. denied, 385 U.S. 1007, 87 S.Ct. 714, 17 L.Ed.2d 545 (1967).

■ Applying the foregoing principles here, defendants fail to show laches, acquiescence, abandonment, or joint use warranting denial of relief. Plaintiffs' failure to institute their suit for infringement of their United States trademarks until 1962 was justified by circumstances revealing that they were neither sleeping on their rights nor leading defendants to believe that no action would be taken, but that, on the contrary, they were for almost the entire period from 1949 to 1962 vigorously asserting and prosecuting their rights.

As early as October, 1949, following the Soviet expropriation of the Foundation's assets in Jena, the Boards in Heidenheim advised Sandmann of defendant VEB and the Jena "Foundation," that plaintiff Foundation claimed the trademarks outside the Soviet Zone but was willing to license the sale of Zeiss-marked VEB Jena manufactured equipment in West Germany, in view of the shortage of equipment. Thereafter, until the reopening of the German Patent Office in August 1950, plaintiffs had no means of enforcing their rights in the Zeiss marks in West Germany. In the meantime, by letter dated February 17, 1950, to VVB Optik, the Board members in Heidenheim claimed ownership for the plaintiff of the marks and proposed that the parties conduct discussions looking toward a license agreement which would recognize plaintiffs' rights but permit the state-owned VEBs to sell Zeiss-marked equipment outside the Soviet Zone, at least during the post-war short-

age. Although the Jena gentlemen, by letter dated April 24, 1950, disputed plaintiffs' claim of ownership (when they were threatened with West German seizure of Jena-made merchandise), they continued negotiations looking toward a license, with the result that when the Board members in Heidenheim again wrote Schrade in December 1951 offering a revocable license without prejudice to the claims of ownership asserted by the Zeiss firm in Heidenheim, the head of the Central Administration at the Ministry of Machine Construction in East Berlin instructed Schrade by letter dated February 25, 1952 to adhere to the license proposal as a "modus vivendi," which was adopted by the Jena VEBs and followed until February 1954. By that time it was clear that the Jena gentlemen, having taken steps to create the sham "Foundation" already described, did not propose to adhere to or implement the license, and the Zeiss firm in Heidenheim accordingly obtained an injunction in the District Court in Goettingen against the distribution in West Germany of Jena-made goods bearing the Zeiss marks. This was followed by the institution in May 1954 of a suit by the Heidenheim Zeiss firm in Duesseldorf against the Zeiss VEB and the DIA seeking to enjoin their sale of Zeiss-marked goods anywhere in the world. Such world-wide relief was granted by the lower court but eventually limited in 1957 by the Federal Civil Supreme Court to the Federal Republic of Germany.

The arrangements thus adopted by the parties prior to February 1954 were negotiated on the express condition that the plaintiffs were not forfeiting their right to prohibit the defendants from using the Zeiss marks or to bring suit for infringement. In addition to the defendants' tacit recognition of plaintiffs' claim of ownership, the plaintiffs, from 1954 on, actively sought to enforce their rights everywhere. Having thus at all times been on full notice of the plaintiffs' claims, defendants here are hardly in the position of innocent or ignorant infringers. Furthermore, the arrangements between the parties during the period from 1951 to 1953 did not constitute a "naked" license waiving quality control inspection, since the Jena-made goods were distributed by the plaintiff and the parties have agreed in this action that the goods were not below established standards for Zeiss-marked merchandise.

Any further action on the plaintiffs' part to assert and preserve their rights was unnecessary, especially in the light of certain other circumstances. Prior to 1955 the annual importation of Jena-made Zeiss-marked goods into the United States was relatively small, except for one year, 1951, when they rose to $290,-000. From the middle of 1955 to the beginning of 1959 the defendants were required by the United States Government to obliterate Zeiss marks from all merchandise imported into the United States, thus rendering it unnecessary to seek relief. Moreover, the fact that the United States trademarks were registered in the name of the Attorney General who had purported to vest them barred plaintiffs from asserting claims in the marks against third parties, 8 C.F.R. § 505.1, and precluded plaintiffs from challenging the Attorney General's ownership. 50 U.S.C. App. § 9. It was not until the entry of a final order upon the *Ercona* appeal in 1960 that the plaintiffs were in a position to sue defendants for infringement of the United States Zeiss trademarks. Counsel were retained in July 1961 and after review of the complicated picture, which took several months, instituted suit on February 14, 1962. In the meantime, defendants, who were well aware of plaintiffs' claims, did not substantially increase their imports into the United States, which declined from $149,000 in 1956 to $129,000 in 1961, and there is no proof that defendants spent large sums on promoting sales or developing the market for their products in the United States.

Under these circumstances, plaintiffs' conduct cannot be said to constitute

laches, acquiescence, or abandonment warranting denial of relief.

■ We next turn to defendants' estoppel defense based on the decision of the court in Ercona Camera Corp. v. Rogers, 120 U.S.P.Q. 100 (D.D.C.1958), affd., 107 U.S.App.D.C. 295, 277 F.2d 94 (1960). Defendants contend that plaintiffs here are estopped from questioning defendants' right to use the Zeiss trade name and marks in the United States for the reasons that (1) the issue was raised and decided in *Ercona* in favor of the defendants' position here, and (2) plaintiffs here, although not parties to the *Ercona* suit, were in privy with the United States Government, a defendant in that suit. A review of the *Ercona* record and comparison of it with that here reveals defendants to be wrong on both counts, and that their estoppel defense is meritless.

The *Ercona* suit arose out of a dispute over the question of whether the Attorney General had acquired ownership of the Zeiss trademarks by virtue of orders purporting to vest them under the Trading with the Enemy Act, 50 U.S. C.A. App. § 7(c). After the Attorney General, claiming such ownership, attempted to stop Ercona Camera Corp. and Steelmasters, Inc. from importing Jena-made merchandise bearing the Zeiss marks into the United States for sale, the latter brought suit in the United States District Court for the District of Columbia seeking to enjoin the Government from interfering with such importation and claiming that the Attorney General's vesting was ineffective for the reason that it purported to seize the Zeiss trademarks only, not as an appurtenance to any business in connection with which they were used. The district court so held and was affirmed on appeal. The defendants base their claim of estoppel on certain issues raised by affirmative defenses interposed by the Government, which were expressly left open by the court and never decided. In its answer the Government in *Ercona* asserted as an affirmative defense that the Jena-manufactured goods were not entitled to bear the Zeiss trademark because they were not manufactured by the Zeiss Foundation, which had been removed from Jena to Heidenheim; and that Steelmasters and Ercona were bound by judgments of the courts of West Germany which decided that Jena-manufactured goods were not entitled to bear the Zeiss trademarks. In support of that position the Government introduced the West German court decisions. In response Ercona (which was represented by counsel for defendants in the present action) successfully argued that the issues raised by the Government's affirmative defenses were irrelevant, the issue being limited to the question of whether the vesting was valid and effective. Accepting this argument, the district court, in ruling in favor of Ercona, made the following finding:

"11. The respective rights, if any, in the 'Zeiss' trademark of the several Carl Zeiss firms now located in East Germany and in West Germany, are not in issue in this case; and the Court expresses no opinion with respect thereto. Nor are the decisions rendered by foreign courts with respect to such rights relevant here." (120 U.S.P.Q. at 105)

Upon appeal the Government did not pursue the matter but limited itself to the question of whether the vesting was sufficient to confer ownership rights in Zeiss trademarks. The limited nature of the issue thus presented on appeal, and the failure to adjudicate the question of which of the parties, as between Heidenheim and Jena, was the owner of the trademarks, was confirmed by the Court of Appeals, which stated:

"The Attorney General has undertaken to bar the importation of Zeiss-marked Jena products solely on the premise that he owns the trademark 'Zeiss' in the United States. We are not required to consider or decide whether Zeiss-marked products produced in East Germany may be barred from the United States for some other reason. Similarly, we are not required

to consider or decide whether Optik Jena possesses any rights of ownership in the mark. Our only question is whether the Attorney General acquired a sufficient interest in the United States rights in the trademark by reason of the various seizures of the mark to entitle him to bar use of the trademark in the United States by others." (277 F.2d at 97)

Although the Government claimed that the Jena-made goods were "spurious," that question was never litigated, Ercona's counsel stating it was "not in issue," and the record is clear that in referring to such goods as being what the Zeiss trademark signified, the district court was concerned only with the question of whether the goods were manufactured in Germany, without distinguishing between Jena and Heidenheim.

■ Furthermore, even if Ercona had made the decision of issues attributed to it by the defendants here, the plaintiffs here would not be bound by that decision because they were neither parties nor privies to that action. The evidence offered in support of defendants' argument that they knew of the case, were kept informed of its progress and supplied evidence to the Government falls far short of demonstrating the control or participation required to establish privity. See Litchfield v. Goodnow, 123 U.S. 549, 8 S.Ct. 210, 31 L.Ed. 199 (1887); United States v. California Bridge & Construction Co., 245 U.S. 337, 38 S.Ct. 91, 62 L.Ed. 332 (1917); Hartford Acc. & Ind. Co. v. First Nat'l Bank, 281 N.Y. 162, 167–168, 22 N.E. 2d 324, 123 A.L.R. 1149 (1939). The alleged "cooperation" on the part of plaintiffs with the Government consisted essentially of supplying copies of the judgments of the West German courts (because the State Department route for obtaining them was slow), and employing private counsel to keep them advised from time to time, but not with any regularity, as to the progress of the Government litigation. Although such counsel discussed the case from time to time with the Government's attorneys

and furnished to them copies of the West German judgments, the Government did not surrender to them any degree of its control of the litigation. Citizens National Trust and Savings Banks of Los Angeles v. United States, 270 F.2d 128 (9th Cir. 1959), cited by defendants in support of their position, presented an altogether different situation which is clearly distinguishable. Although the court there made reference to the fact that the bank had knowledge of the action and employed a legal representative to audit the earlier trial, the existence of privity was based on the insurer-insured relationship between the bank and the United States with respect to a note ruled not valid and enforceable in an earlier suit by the United States, as well as upon the assignor-assignee relationship stemming from assignment of the note by the bank to the United States. No such relationships existed here between plaintiffs and the Government in the *Ercona* suit.

■ Defendants' third argument in support of its estoppel defense, that plaintiffs are bound by the *Ercona* decision because they succeeded to the Attorney General's interest in the stock of Carl Zeiss, Inc. of New York (which they purchased from the Government) is likewise without merit. Carl Zeiss, Inc., was not a party to the *Ercona* action. Although the decision was concerned with the question of how the vesting of its stock affected the vesting of the trademarks, that issue is not relevant here. The acquisition of the stock of Carl Zeiss, Inc., therefore, does not result in the *Ercona* decision binding the plaintiffs with respect to an issue not decided in *Ercona*, namely, the right of Jena-manufactured goods to bear the Zeiss marks. Defendants' estoppel defense may therefore be dismissed as frivolous.

### CONCLUSION

■ Plaintiff Carl Zeiss Stiftung (the "Zeiss Foundation") is entitled to the sole and exclusive right to use the various Zeiss trademarks and trade names in dispute and plaintiff Zeiss

Ikon A.G. of Stuttgart is entitled to the sole and exclusive right to use the Zeiss Ikon trademark and trade name.

Since at least 1953 defendants V.E.B. Carl Zeiss Jena, Steelmasters and Ercona have infringed the trademarks of the plaintiff Carl Zeiss Foundation in the United States and have unfairly competed with the plaintiffs through the use of the trade names "Optik", "Carl Zeiss Jena VEB" and "VEB Carl Zeiss Jena" and trademarks consisting of the words "Carl Zeiss Jena" in a distinctive lens frame, the distinctive lens frame alone, and the letters "CZ".

Since in or about 1953 the defendants V.E.B. Carl Zeiss Jena, Steelmasters and Ercona have, in violation of § 43(a) of the Lanham Act, from time to time falsely described and falsely designated the origin of goods imported by them into the United States and sold in United States commerce as being goods produced by a licensee of plaintiff Carl Zeiss when in fact such goods were produced by defendant V.E.B. Carl Zeiss Jena, a nationalized East German concern, which has no legal or other connection with plaintiff Carl Zeiss Foundation or any of its affiliated firms.

Subject to resolution of the issues raised by defendants' antitrust counterclaims, trial of which has been deferred at the parties' request, each plaintiff is entitled to enforcement of its rights in its marks and trade names against the defendants and to the relief, including damages and injunctive relief, demanded against the defendants, and the defenses asserted by the defendants, other than that based on alleged violation of the antitrust laws, are dismissed for the reasons hereinbefore stated.

Review of the legal and factual issues raised by defendants' antitrust counterclaims, and of the damage issues, will proceed promptly. Toward that end the parties are directed (1) to meet together for the purpose of stipulating all facts not in dispute, designating, identifying, and marking exhibits, listing witnesses to be called, designating portions of depositions to be offered, and setting forth any objections thereto, and (2) to submit to the Court, on or before December 16, 1968, all stipulated facts, exhibits to be offered, designations of deposition testimony and objections, and trial briefs.

Pursuant to Rule 52(a), F.R.Civ.P., the foregoing shall constitute the Court's findings of fact supplementing those simultaneously filed on this date and shall constitute the Court's conclusions of law.

Pending trial and disposition of the remaining issues, a final order and judgment will be deferred.

So ordered.